# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-883 |
| | ) | |
| PETE HEGSETH, in his official capacity as Secretary of Defense, | ) | |
| | ) | |
| TULSI GABBARD, in her official capacity as Director of National Intelligence, | ) | |
| | ) | |
| JOHN L. RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency, | ) | |
| | ) | |
| SCOTT BESSENT, in his official capacity as Secretary of the Treasury, | ) | |
| | ) | |
| MARCO A. RUBIO, in his official capacities as Secretary of State and Acting Archivist of the United States, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

ARGUMENT.......................................................................................................................2

I.    American Oversight and the Public Have Suffered and Will Continue To Suffer Irreparable Harm from the Deletion of Federal Records that Are Responsive To Pending FOIA Requests. .................................................................................................2

II.    American Oversight is Likely to Succeed on the Merits of all Counts in Its Amended Complaint............................................................................................................................3

    A.    American Oversight is Likely to Succeed on Its Pattern-and-Practice Claim (Count IV) Because Defendants' Individual Practices Amount to Informal Policies Permitting the Routine Creation and Destruction of Agency-Head Signal Messages in Violation of the FRA. ..............................................................................................5

        1.    Defendants' sworn declarations, public testimony, and reliable reporting shows that the agency-head Defendants regularly create federal records because they have used and continue to use Signal to conduct government business........................................5

        2.    The sworn declarations and reliable reporting show that the agency-head Defendants lost federal records because they have not independently preserved the entire Houthi PC Small Group Chat and they have lost other Signal messages................................9

        3.    The evidence shows that agency-head Defendants' conduct has created informal policies.........................................................................................................................11

    B.    American Oversight is Likely to Succeed on Its Recordkeeping Program Claim (Count III) Because Defendants' Written Policies Regarding Signal Messages Do Not Comply with the FRA. ........................................................................................14

    C.    American Oversight is Likely to Succeed on Its Enforcement Action Claims (Counts I, II, V, and VI) Because Defendants Have Learned of the Actual or Threatened Unlawful Removal of Federal Records but Have Not Initiated Enforcement Actions Under 44 U.S.C. § 3106. ...........................................................................................18

III.    The Balance of Hardships and Public Interest Require Injunctive Relief. ...................21

IV.    The Court Should Not Require a Bond.........................................................................21

CONCLUSION..................................................................................................................22

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*ACLU Found. of Fla. v. U.S. Immig. & Customs Enf't*,
  22-cv-01129 (CJN), 2023 WL 6461053 (D.D.C. Aug. 31, 2023) ........................................... 19

*Am. First Legal Found. v. Becerra*,
  24-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024) ................................................... 2, 20

*American Immigration Council v. U.S. Dep't of Homeland Sec.*,
  950 F. Supp. 2d 221 (D.D.C. 2013) ......................................................................................... 10

*Armstrong v. Bush*,
  924 F.2d 282 (D.C. Cir. 1991) ................................................................................................. 11

*Assoc. Press v. Budowich*,
  25-cv-00532 (TNM), 2025 WL 1039572 (D.D.C. Apr. 8, 2025) ............................................ 21

*Cause of Action Inst. v. Tillerson*,
  285 F. Supp. 3d 201 (D.D.C. 2018) ......................................................................................... 19

*Citizens for Responsibility & Ethics in Washington v. Pompeo*,
  19-3324 (JEB), 2020 WL 1667638 (D.D.C. Apr. 3, 2020) ......................................... 11, 12, 14

*Judicial Watch, Inc. v. FBI*,
  18-2316 (RC), 2019 WL 4194501 (D.D.C. Sept. 4, 2019) ................................................ 14, 15

*Judicial Watch, Inc. v. Kerry*,
  844 F.3d 952 (D.C. Cir. 2016) ................................................................................................. 18

*Judicial Watch, Inc. v. Tillerson*,
  293 F. Supp. 3d 33 (D.D.C. 2017) ........................................................................................... 18

*Karem v. Trump*,
  404 F. Supp. 3d 203 (D.D.C. 2019) ........................................................................................... 4

*Monell v. Dept' of Soc. Svcs.*,
  436 U.S. 658 (1978) ................................................................................................................. 13

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) ........................................................................................................ 4

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986) ................................................................................................................. 13

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Price v. U.S. Dep't of Justice*,
  18-cv-1339 (CRC), 2019 WL 2526439 (D.D.C. June 19, 2019) ............................................. 20

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981) ................................................................................................................ 4

**Statutes**

42 U.S.C. § 1983 .......................................................................................................................... 13
44 U.S.C. § 3105 .......................................................................................................................... 21
44 U.S.C. § 3106 .................................................................................................................... passim
44 U.S.C. §§ 2201–2209 ............................................................................................................... 3

**Rules**

Fed. R. Evid. 602 ........................................................................................................................... 4

**Regulations**

36 C.F.R. § 1230.10 ............................................................................................................. 5, 11, 18

**INTRODUCTION**

Defendants' recitation of five agency polices—which, if they had been adequately crafted and implemented, would have presumably ensured preservation of the "Houthi PC Small Group Chat," Am. Compl. ¶ 2, ECF No. 17—underscores the weight of evidence demonstrating that the agency-head Defendants have, in practice, informally excused themselves from compliance with their agencies' record retention rules. As the highest officials within their respective agencies, the Federal Records Act ("FRA") grants the agency-head Defendants the authority and responsibility to shape and implement recordkeeping policies from the top-down for their entire agencies. Defendants do not deny that each of them failed to independently preserve the entirety of the Houthi PC Small Group Chat, as the FRA required. They also do not deny that they have used and continue to use Signal chats for other government work. Nor do they deny that they have failed to preserve messages from those additional chats.

Instead, Defendants attempt to downplay the severity of their violations and ask the Court to allow them to continue with their current practices. And Defendants focus almost entirely on the original Houthi PC Small Group Chat that motivated the original complaint and motion for a temporary restraining order, largely ignoring the *other* Signal communications embraced by the amended complaint, motion for a preliminary injunction, and evidence in the record.

The public is entitled to more from the heads of these agencies—the individuals with a statutorily mandated duty to establish records management programs and safeguards against the loss or removal of records from their respective agencies—and a preliminary injunction is necessary to protect both the public and American Oversight from the continued, irreparable loss

of federal records. For these reasons, and those stated more fully below, American Oversight respectfully requests that the Court grant its motion for a preliminary injunction.

**ARGUMENT**

I.    **AMERICAN OVERSIGHT AND THE PUBLIC HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM FROM THE DELETION OF FEDERAL RECORDS THAT ARE RESPONSIVE TO PENDING FOIA REQUESTS.**

While the agency-head Defendants are careful to avoid conceding that they have routinely failed to preserve their Signal messages since taking office, they have noticeably *not* represented that they have saved and continue to save their Signal correspondence in accordance with the FRA. Even as it relates to the Houthi PC Small Group Chat—which the Court ordered Defendants to preserve, Min. Order (Mar. 27, 2025)—not one agency-head Defendant has informed the Court that the entirety of the chat has been saved. This prior and continued loss of federal records presents a quintessential category of irreparable harm to FOIA requesters like American Oversight because the loss of such records "is a harm that cannot be cured once the records are lost or destroyed." *Am. First Legal Found. v. Becerra*, No. CV 24-1092 (RC), 2024 WL 3741402, at *14 (D.D.C. Aug. 9, 2024).

Defendants do not dispute that American Oversight has pending FOIA requests seeking all agency-head Defendants' Signal messages sent from the time each individual took office through the dates searches for such messages are conducted. *See* Am. Compl. ¶¶ 113, 124, 131, 136, 141, ECF No. 17; 2d Sparks Decl. ¶¶ 10, 16, 19–21, ECF No. 19-2. These FOIA requests have been pending since March 25, 2025, *see id.*, and seek the precise categories of records that American Oversight's instant motion aims to protect for the life of this litigation, *see generally* Mot. Prelim. Inj., ECF No. 19.

2

Defendants' reference to an email from White House Counsel's Office purporting to contain a "consolidated version" of the Houthi PC Small Group Chat only serves to highlight the imminent risk of irreparable harm American Oversight faces. *See* Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 9, ECF No. 22. Setting aside the ambiguity of the phrase "consolidated version" and the question of what "content" has not been published by *The Atlantic*, *id.*, the referenced email is wholly irrelevant. The White House is generally subject to different records statutes, *see* 44 U.S.C. §§ 2201–2209, and has no place in the Defendants' statutory or regulatory scheme for preserving existing federal records and Defendants do not characterize the email as part of a larger effort to recover lost records. In short, the vague reference to an email from White House Counsel's Office is incapable of mitigating or remedying the harm already incurred and simply distracts from Defendants' failure to ensure the protection of federal records created through Signal.

In sum, Defendants do not meaningfully dispute that the prior and continued loss of Signal messages responsive to American Oversight's pending FOIA requests amount to irreparable harm. Accordingly, a preliminary injunction ordering Defendants to preserve federal records at imminent risk of destruction is necessary.

## II.    AMERICAN OVERSIGHT IS LIKELY TO SUCCEED ON THE MERITS OF ALL COUNTS IN ITS AMENDED COMPLAINT.

Defendants' declarations, Defendants' sworn public testimony, and reliable media reports establish a record sufficient for the Court to find that American Oversight will succeed on the merits of its FRA claims. Specifically, the record shows that American Oversight is more than likely to succeed on the merits of its claims that: the agency-head Defendants have established informal policies or practices of failing to safeguard the federal records they create through their use of Signal (Count IV); the agency-head Defendants have failed to implement adequate recordkeeping programs to safeguard their Signal messages (Count III); and the agency-head

Defendants and Acting Archivist Rubio failed to initiate enforcement actions under 44 U.S.C. § 3106 as to the actual or threatened unlawful removal of the Houthi PC Small Group Chat (Counts I, V) and the agency-head Defendants' other Signal chats (Counts II, VI). *See* Am. Compl. ¶¶ 155–217, ECF No. 17.

The Court should not entertain Defendants' argument against American Oversight's reliance on reputable news reports to support its motion. *See* Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 1, 19–20, ECF No. 22. A preliminary injunction's purpose is to preserve the relative status quo until a resolution on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* To that end, district courts are generally permitted "'to rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction.'" *Karem v. Trump*, 404 F. Supp. 3d 203, 215 n.3 (D.D.C. 2019) (quoting *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases)).

Here, Defendants do not challenge the authenticity, reliability, or accuracy of any of the news reports on which American Oversight bases its motion. Thus, just as the Court may, at this early stage, accept the Department of Defense ("DoD") declarant's statements based not on personal knowledge but "on information and belief," Bennett Decl. ¶ 1, ECF No. 22-3; Fed. R. Evid. 602, the Court can also accept the reliable and accurate statements in cited news reports.

Taking such reliable reporting together with the sworn declarations on file and Defendants' sworn testimony before members of Congress, the Court should find that American Oversight is likely to succeed on the merits of its FRA claims.

4

**A.     American Oversight is Likely to Succeed on Its Pattern-and-Practice Claim (Count IV) Because Defendants' Individual Practices Amount to Informal Policies Permitting the Routine Creation and Destruction of Agency-Head Signal Messages in Violation of the FRA.**

The record supports a finding that the agency-head Defendants—by virtue of their personal recordkeeping practices and the legal authority vested in their positions—have established standalone informal policies within each agency that permit the unlawful or accidental destruction of agency-heads' Signal messages. This is not a case involving individual lower-level employees who violated agency record retention policies; the agency-head Defendants, through their actions openly ignoring the nominal written policies, create their agencies *actual* policies. By failing to fully and independently preserve the Houthi PC Small Group Chat, every agency-head Defendant shirked their mandatory obligation to "[p]revent the unlawful or accidental removal, defacing, alteration, or destruction of records." *See* 36 C.F.R. § 1230.10.

But Defendants do not so much as acknowledge that five agency-heads separately failed to prevent the loss of federal records, and they noticeably make no representations about how similar failings will be avoided in the future. This is because the agency-head Defendants' failures to preserve the Houthi PC Small Group Chat were part of a wider, ongoing pattern and practice permitting the destruction of cabinet-level Signal communications. This pattern and practice whereby the agency-head Defendants have effectively exempted themselves from their own agencies' preservation regulations is shown through both the evidence in the record and reliable public reporting. There are obvious evidentiary statements that Defendants could have made to refute American Oversight's pattern-and-practice claim, and Defendants' decision not to state the obvious speaks volumes.

       *1.     Defendants' sworn declarations, public testimony, and reliable reporting shows that the agency-head Defendants regularly create federal records*

*because they have used and continue to use Signal to conduct government business.*

Presented with multiple sources of evidence confirming widespread use of Signal, the agency-head Defendants could have denied that they *have used and continue to use* Signal to conduct government business other than in the Houthi PC Small Group Chat. However, none of the agency-head Defendants have denied that allegation, as such denials would conflict with the evidence and reporting in the record.

First, Defendant Bessent's Signal use extends beyond the Houthi PC Small Group Chat. In the most recent declaration submitted on behalf of the Department of the Treasury ("Treasury"), the declarant states that all of Defendant Bessent's "remaining existing messages in his Signal account, *in addition to* the messages from the Houthi PC Small Group Chat" were saved one day after the Court ordered Defendants to preserve messages from the Houthi PC Small Group Chat. *See* Pilkerton Decl. ¶ 7, ECF No. 22-4 (emphasis added); Min. Order (Mar. 27, 2025). This revelation confirms that Defendant Bessent sent or received multiple Signal messages outside the Houthi PC Small Group Chat and had yet to archive them until March 28, 2025.

Similarly, Defendant Ratcliffe's Signal use is not limited to the Houthi PC Small Group Chat. A previously filed declaration establishes that Defendant Ratcliffe accessed the Houthi PC Small Group Chat via his "personal Signal account." Blankenship Decl. ¶ 3, ECF No. 10-3. Defendant Ratcliffe also previously testified before the Senate Intelligence Committee that, "one of the first things that happened when [he] was confirmed as CIA Director was Signal was loaded

onto [his] computer at the CIA, as it is for most CIA officers."[1] Defendant Ratcliffe went on to testify that Signal is a "permissible work use." *Supra* note 1. The only reasonable inference to be drawn from this evidence is that Defendant Ratcliffe's use of Signal for agency business was not confined to the Houthi PC Small Group Chat.

Next, Defendants Gabbard and Rubio used Signal outside of the Houthi PC Small Group Chat. A photograph has emerged since American Oversight filed its Amended Complaint and motion for a preliminary injunction indicating that Defendants Gabbard and Rubio engaged in separate Signal chats with former National Security Advisor Mike Waltz.[2] In particular, the photograph reveals the screen of Waltz's phone during an April 30, 2025 cabinet meeting and appears to show his use of a modified Signal-compatible application called TeleMessage, along with separate chats with individuals whose names are partially obscured, but appear to be Defendants Rubio and Gabbard:

---

[1] *DNI Director Gabbard, FBI Director Patel and Other National Security Officials Testify on Global Threats*, C-Span (Mar. 25, 2025), at 44:45–45:45, *available at* https://www.c-span.org/program/senate-committee/dni-director-gabbard-fbi-director-patel-and-other-national-security-officials-testify-on-global-threats/657476.

[2] *See* Lily Hay Newman, *Signal Clone Used by Mike Waltz Pauses Service After Reports It Got Hacked*, Wired (May 5, 2025, 5:24 p.m.), https://www.wired.com/story/signal-clone-used-by-mike-waltz-pauses-service-after-reports-it-got-hacked/#intcid=_wired-article-bottom-recirc_a2544a0d-a90c-43fe-9ac3-5133f94a6111_roberta-similarity1_fallback_text2vec1.



*Id.* (arrows added by counsel for American Oversight). The photo depicting Gabbard's apparent

use of Signal beyond the Houthi PC Small Group Chat is consistent with her sworn testimony from

March 26, 2025, before the House Intelligence Committee that, "[t]he Signal message app comes

pre-installed on government devices."[3]

      Further, Defendant Hegseth's use of Signal extends beyond the Houthi PC Small Group

Chat. New, reliable reporting has again confirmed that Defendant Hegseth "used Signal more

extensively for official Pentagon business than previously disclosed, engaging in at least a dozen

---

[3] *National Security and Intelligence Officials Testify on Global Threats*, C-Span (Mar. 26, 2025),
at 27:29–27:33, *available at* https://www.c-span.org/program/house-committee/national-security-
and-intelligence-officials-testify-on-global-threats/657380.

separate chats. . . ."[4] Those chats were reportedly used to "inform foreign governments about an unfolding military operation," and "discuss media appearances, foreign travel, his schedule and other unclassified but sensitive information. . . ." *Supra* note 4. According to the *Wall Street Journal*, Defendant Hegseth "set up many of the chats himself, sending texts from an unsecured line in his Pentagon office and from his personal phone. . . ." *Id.* This latest reporting builds on previous reports about Defendant Hegseth using a Signal chat titled "Defense | Team Huddle" since January 2025 to communicate with family members, aides, and advisors about a range of government work, including the forthcoming military strikes discussed in the Houthi PC Small Group Chat. *See* Pl.'s Mem. Supp. Mot. Prelim. Inj. 2 n.1, ECF No. 19-1.

> 2.    *The sworn declarations and reliable reporting show that the agency-head Defendants lost federal records because they have not independently preserved the entire Houthi PC Small Group Chat and they have lost other Signal messages.*

In response to sworn declarations and reputable stories confirming the loss of Signal messages, the agency-head Defendants could have disputed American Oversight's observation that *none* of them managed to independently preserve the Houthi PC Small Group Chat in its entirety. But they did not. The agency-head Defendants also could have denied that they lost one or more of their messages from other Signal chats. But they did not. As with their wider use of Signal, the available evidence fills in the gaps left by the absence of denials.

Defendants have already admitted that Defendant Ratcliffe failed to independently preserve *any* substantive messages from the Houthi PC Small Group Chat. Suppl. Blankenship

---

[4] Alexandar Ward & Nancy Youssef, *Hegseth Used Multiple Signal Chats for Official Pentagon Business*, Wall St. Journal (May 5, 2025, 5:52 p.m.), https://www.wsj.com/politics/national-security/pete-hegseth-signal-chats-defense-department-pentagon-ec9a4daa.

Decl. ¶ 4, ECF No. 15-3. Defendant Ratcliffe's loss of all substantive messages is belied by his

March 25, 2025 sworn testimony before the Senate Intelligence Committee, where he said that

Signal is:

> permissible to use to communicate and coordinate for work
> purposes, *provided . . . that any decisions that are made are also
> recorded through formal channels*. So those were procedures that
> were implemented—my staff implemented those processes,
> followed those processes, complied with those processes. . . . So my
> communications, to be clear, in the Signal message group were
> entirely permissible and lawful. . . .

*Supra* note 1 at 45:45–46:45 (emphasis added). Thus, even before the Court ordered Defendant

Ratcliffe to preserve the Houthi PC Small Group Chat, he was aware of and still failed to meet the

most basic preservation obligations under the FRA. If Defendant Ratcliffe's clear understanding

of the FRA's recordkeeping requirements and an order from this Court did not prevent his loss of

all substantive messages from the Houthi PC Small Group Chat, the Court may infer that

Defendant Ratcliffe lost Signal messages from his other chats, too.

The other agency-head Defendants ostensibly managed to preserve "partial" aspects of the

Houthi PC Small Group Chat, but the evidence shows that such preservation efforts were merely

in response to this lawsuit such that their other Signal chat messages are surely at risk or have been

lost. For instance, Defendant Bessent admitted that he independently recovered only a fraction of

substantive messages from the Houthi PC Small Group Chat, and that he was able to preserve only

the "remaining existing" messages from other Signal chats. Pilkerton Decl. ¶¶ 6–7, ECF No. 22-

4. According to the latest reporting about Defendant Hegseth's use of Signal outside of the Houthi

PC Small Group Chat, "[i]n some cases, Hegseth's messages disappeared without being properly

recorded." *Supra* note 4. As to the Houthi PC Small Group Chat, a DoD declarant maintains that

Defendant Hegseth preserved "existing Signal application messages," but provides no information

as to whether any substantive messages actually exist, or if the number of still-"existing" messages is zero. Suppl. Bennett Decl. ¶ 2, ECF No. 15-1. Declarations submitted on behalf of Defendants Gabbard's and Rubio's agencies are similarly vague about what existing messages, if any, were preserved from the Houthi PC Small Group Chat. ODNI took "screen shots of the messages currently in existence," Koch Decl. ¶ 4, ECF No. 10-2, and the State Department ("State") captured "images of the Signal chat in the possession of the Office of the Secretary. . . ." Kootz Decl. ¶ 3, ECF No. 15-4. Notably, none of the declarations purport to show whether or how Defendants Hegseth, Gabbard, and Rubio preserved the Houthi PC Small Group Chat in accordance with established agency regulations. It is incredibly unlikely that those Defendants' other Signal messages were subject to stronger preservation efforts, if there was any effort to preserve them at all. Given this demonstrated pattern of noncompliance, Defendants should not be entitled to any presumption of compliance. *Cf. American Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 248 (D.D.C. 2013) (explaining that the presumption of compliance "does not obviate the government's obligation to carry its evidentiary burden and fully explain its decisions on segregability" in FOIA productions).

> 3.    *The evidence shows that the agency-head Defendants' conduct has created informal policies.*

The totality of evidence and reliable reporting shows a pattern of conduct among the agency-head Defendants that permits the regular creation and deletion of Signal messages. No agency-head Defendant suggests that their individual failure to preserve the entire Houthi PC Small Group Chat was the result of anomalous noncompliance with agency policy or some other mishap that coincidentally and simultaneously struck four other members of the President's cabinet. Instead, the agency-head Defendants simply refuse to disclose how many messages were lost. But by failing to explain both how and why the Houthi PC Small Group Chat was—to some

degree—lost *five times over*, the agency-head Defendants have created an inescapable inference that the practices employed across the highest levels of five government agencies permit the regular creation and destruction of agency leaders' federal records. "[T]he FRA understandably leaves the details of records management to the discretion of individual agency heads," *Armstrong v. Bush*, 924 F.2d 282, 293 (D.C. Cir. 1991), and each agency-head Defendant in this case has demonstrated the existence of an informal policy allowing for the regular creation and loss of agency-head Signal messages.

The weight of the evidence and public reporting shows that the agency-head Defendants— all of whom hold the statutory authority and responsibility for establishing and maintaining recordkeeping programs for their respective agencies, 36 C.F.R. § 1230.10—use or have used Signal with some degree of regularity and without regard for the written policies supposedly governing the retention of such messages. The scale, prevalence, and specificity of this cross-agency practice stands in contrast to the facts of *Citizens for Responsibility & Ethics in Washington v. Pompeo*, 19-3324 (JEB), 2020 WL 1667638 (D.D.C. Apr. 3, 2020).

In that case, the Court held that the plaintiff's allegations "merely describe[d] Defendants' isolated violations of the guidelines governing records creation rather than an agency-wide policy that violates the FRA." *Id.* at *5. The Court reasoned that much of the plaintiff's complaint related to officials who were not employed by the State Department or subject to the FRA, and, at most, focused on "a few isolated actions involv[ing] some State Department personnel," as opposed to "a policy orchestrated from the highest levels." *Id.* at *5–6.

Here, the agency-head Defendants' conduct has created just that: a policy orchestrated from literally the highest levels. The evidence and reliable public reporting show that the agency-head Defendants' Signal usage is siloed outside the reach of their respective agencies' written policies.

Despite every written policy generally prohibiting the use of non-official electronic messaging applications like Signal, every agency-head Defendant has participated in Signal chats including and beyond the Houthi PC Small Group Chat. *See* Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 4–6, ECF No. 22; Pilkerton Decl. ¶ 7, ECF No. 22-4; Suppl. Blankenship Decl. ¶ 4, ECF No. 15-3; *supra* notes 1–4. And despite every written policy requiring complete preservation of Signal messages within 20 days, no agency-head Defendant has represented that they preserved more than, at most, mere fragments of the Houthi PC Small Group Chat. Based on available evidence and reporting, Defendants' other Signal communications likely faced similar fates—substantial loss, with perhaps a few remnants preserved. *See* Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 4–6, ECF No. 22; Pilkerton Decl. ¶¶ 6–7, ECF No. 22-4; Suppl. Bennett Decl. ¶ 2, ECF No. 15-1; Koch Decl. ¶ 4, ECF No. 10-2; Kootz Decl. ¶ 3, ECF No. 15-4; *supra* notes 1–4.

Defendants make no attempt to explain why the Houthi PC Small Group Chat was lost, and they do not represent that the loss was isolated. Indeed, the agency-head Defendants have not, even once in this case, taken the simple step of claiming that their individual recordkeeping practices protect against the routine creation and loss of their Signal messages. Rather, they offer written policies that appear to be divorced from their evidenced actual practices.

The agencies' actual policies and practices are defined not by the official written policies that agency lawyers and record specialists can trot out from somewhere within the agency's file system, but by their *actual* policies, practices, and customs set by the agency heads. *Cf. Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (explaining that, under 42 U.S.C. § 1983 and *Monell v. Dept' of Soc. Svcs.*, 436 U.S. 658 (1978), decisions by officials with final policymaking authority can establish official government policy even if it contradicts written policy). As the evidence and reporting shows, the agency-head Defendants maintain practices outside the

boundaries of their agencies' written policies both as to the regular use of Signal and the loss of records created within the application. By including members of their staff in the Houthi PC Small Group Chat, the agency-head Defendants communicated, implicitly or otherwise, from the top-down that compliance with agency recordkeeping policies is optional. The Houthi PC Small Group Chat put on public display the gap between the agency-head Defendants' actual practices and the written policies of their agencies. Defendants' failure to bridge this gap in response to American Oversight's motion, coupled with the evidence discussed above, shows that the agency-head Defendants have created for themselves informal policies permitting the arbitrary and capricious removal of federal records that they created in Signal.

### B. American Oversight is Likely to Succeed on Its Recordkeeping Program Claim (Count III) Because Defendants' Written Policies Regarding Signal Messages Do Not Comply with the FRA.

There are at least two glaring omissions in Defendants' relevant written policies (i.e., "particular deficiencies") that render American Oversight's claims justiciable and likely to succeed on the merits: (i) a lack of procedures for preserving records potentially responsive to pending FOIA requests; and (ii) a lack of procedures for implementing the recordkeeping safeguards that the FRA and the policies themselves require. In this way, Defendants are therefore wrong to contend that American Oversight's recordkeeping claim is distinct from the claims this Court deemed justiciable in *Judicial Watch v. FBI*. *See* Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 15–16, ECF No. 22. American Oversight's claim relies not only on Defendants' pattern of violations of agency policies and applicable law, but also on the deficient policies that created the conditions for Defendants' "systemic noncompliance" and are therefore "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *See Judicial Watch, Inc. v. FBI*, No. 18-2316

(RC), 2019 WL 4194501, at *6, *9 (D.D.C. Sept. 4, 2019); *see also Pompeo*, 2020 WL 1667638, at *6.

First, American Oversight's claim is justiciable because of Defendants' failure to craft policies to ensure that records are available to respond to FOIA requests. Throughout the first quarter of 2025, American Oversight submitted FOIA requests to each of Defendants' agencies for Signal messages and other materials. *See* Am. Compl. ¶¶ 111–41, ECF No. 17; *see also* 2d Sparks Decl. ¶¶ 9–21, ECF No. 19-2. Yet *only* the Treasury Department's recordkeeping policy includes preservation requirements for records that fall within the scope of FOIA requests. *See* Pilkerton Decl. 23–25, ECF No. 22-4 (Text and Instant Messaging Records. Policy, May 22, 2019).

The recordkeeping policies of the other relevant agencies lack procedures for preserving records necessary to adequately respond to FOIA requests. This failure harms American Oversight because the agencies will likely lose responsive records while American Oversight's FOIA requests are pending. These types of deficiencies are analogous to those raised in *Judicial Watch v. FBI*, where the plaintiff alleged that it was "unable to obtain electronic messages through FOIA requests to the FBI" because the FBI's recordkeeping program lacked "effective controls over the maintenance of electronic messages." *Judicial Watch*, 2019 WL 4194501, at *3. Taken together, these omissions, Signal's decentralized approach to storage (messages only reside on individual users' phones), and Defendants' apparent use of Signal's autodelete function have contributed to Defendants' violation of the FRA. *See* Am. Compl. ¶¶ 60–63, ECF No. 17; *supra* note 4.

Second, the written policies instruct the agencies to create processes for preserving non-email electronic records, like Signal messages, but they offer no guidance on how those objectives should be achieved. *See e.g.*, Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. Ex. 2 at 4, ECF No. 22-2 [hereinafter "DoD Instruction"]; Pilkerton Decl. 20, ECF 22-4; Williams Decl. ¶ 6, ECF No. 22-6

15

(noting that CIA's policy is "written primarily to address email retention"). Inexplicably, *none* of the policies expressly instruct agency heads *how* to ensure compliance with the FRA and mitigate the unlawful destruction of records, beyond offering a list of nebulous job responsibilities for certain more junior officials. *See, e.g.*, DoD Instruction 7–11, ECF No. 22-2; Newton Decl. 9–13, ECF No. 22-5. In effect, this leaves implementation to the agency-head Defendants' unchecked discretion, which in turn results in the unlawful dissemination and destruction of records. American Oversight's challenge to the adequacy of the agencies' recordkeeping guidelines for their lack of explicit direction regarding how Defendants should go about implementing the required safeguards is reviewable under the APA. *See Judicial Watch*, 2019 WL 4194501, at *5–6.

Critically, neither the FRA nor any of the relevant recordkeeping policies excuse Defendants from performing their unique preservation obligations if parts of records are by happenstance published by a media outlet. *Cf.* Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 12–14, ECF No. 22. Likewise, the irrelevant April 8, 2025 email from White House Counsel's Office transmitting a "consolidated version" of the Houthi PC Small Group Chat to Defendants' agencies, *id.* at 9, 13, arrived more than twenty days after the creation of the relevant messages, which is insufficient to satisfy the State, DoD, and Treasury policies, *id.* Ex. 1 at 7, ECF 22-1; DoD Instruction 4, ECF No. 22-2; Pilkerton Decl. 28, ECF No. 22-4. Moreover, in reality, the extraordinary steps taken by the White House Counsel's Office to secure these messages only demonstrates the inadequacy of the applicable policies.

Notwithstanding Defendants' repeated attempts to cast this case revolving around a single incident (the deletion of the Houthi PC Small Group Chat), Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 6, 12–14, 21, ECF No. 22, the claims in American Oversight's Amended Complaint arise from

*all* of Defendants' Signal chats that they must preserve under the FRA, *see* Am. Compl. ¶¶ 167–99, 208–17, ECF No. 17. In addition to Defendants Gabbard's and Ratcliffe's testimony before the Senate Intelligence Committee that Signal is readily available and permissible within this administration, *see supra* note 1, the Acting General Counsel of the Treasury Department has now expressly confirmed Defendant Bessent's possession of other Signal chats, Pilkerton Decl. ¶ 7, ECF No. 22-4.

Additionally, while many of the agencies' recordkeeping policies expressly prohibit or at least caution against using nongovernmental messaging platforms like Signal to conduct government business absent extenuating circumstances, those special situations are vaguely defined. Defs.' Mem. Opp. Pl.'s Prelim. Inj. Ex. 1 at 6, ECF No. 22-1; DoD Instruction 4, ECF No. 22-2; Pilkerton Decl. 29, ECF No. 22-4; Newton Decl. 9, ECF No. 22-5; Williams Decl. 8, ECF No. 22-6. Additionally, none of the officials who submitted declarations on behalf of the agency-head Defendants asserted that Defendants actually followed their respective agencies' policies or that the conditions necessitating the use of a nongovernmental application existed in any of Defendants' instances of using Signal. And those restrictions did not stop Defendant Hegseth from using both his publicly available cellphone number and personal computer to discuss government business via Signal.[5] *See also supra* note 4. Regardless of any written instruction to create safeguards for preserving Signal messages contained in any of Defendants' agencies' recordkeeping policies, Defendants' consistent noncompliance demonstrates that those policies are incomplete and ineffective. After all, if the agency heads themselves could not manage to

---

[5] Helene Cooper et al., *Hegseth's Personal Phone Use Created Vulnerabilities*, N.Y. Times (Apr. 25, 2025), https://www.nytimes.com/2025/04/25/us/politics/pete-hegseth-phone-signal.html.

follow the policies, how could other agency personnel be expected to understand and comply with their obligations?

In sum, gesturing to aspirational policies cannot suffice for Defendants to evade judicial scrutiny when Defendants do not actually implement or follow those policies. The aforementioned policy omissions relating to FOIA and preservation procedures invite agency heads to fill gaps with informal, unwritten policies that contravene the FRA. *See supra* § II.A. This Court's precedents against micromanaging the implementation of agency policies should not be misapplied here to allow Defendants to shield themselves from liability for rampant noncompliance.

### C.    American Oversight is Likely to Succeed on Its Enforcement Action Claims (Counts I, II, V, and VI) Because Defendants Have Learned of the Actual or Threatened Unlawful Removal of Federal Records but Have Not Initiated Enforcement Actions Under 44 U.S.C. § 3106.

Rather than addressing all of American Oversight's claims referencing 44 U.S.C. § 3106, Defendants instead focus solely on the Houthi PC Small Group Chat and seemingly ignore all other Signal chats in which they have participated in their official capacities. Defs.' Mem. Opp. Pl.'s Prelim. Inj. 13–14, ECF No. 22. But the failure of the agency-head Defendants and the Acting Archivist to preserve federal records amounts to unlawful withholding of and arbitrary and capricious agency action. *See* Pl.'s Mem. Supp. Mot. Prelim. Inj. 13, 29, ECF No. 19-1.

First, with respect to the Houthi PC Small Group Chat, Defendants each have unique preservation obligations under the FRA that they cannot satisfy vicariously through each other's actions, let alone through extraordinary intervention by the White House Counsel's Office. *See, e.g.*, 36 C.F.R. § 1230.10. Nor is it sufficient for the Houthi PC Small Group Chat to have been published by *The Atlantic*, as this type of record "preservation" presumably will not recur. The FRA does not contain carveouts or exceptions to Defendants' mandatory duties to initiate enforcement actions

18

Defendants also distort American Oversight's reference to Signal's representation that messages transmitted on the application "cannot be accessed by [Signal] or other third parties" and treat this as a license to stop trying to collect and preserve documents. Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 20–21, ECF No. 22. Regardless of Signal's statement of policy, if any entity might have the wherewithal to recover deleted Signal messages from personal devices, it would be the U.S. government and, specifically, Defendants' respective agencies, which include the Central Intelligence Agency and the Office of the Director of National Intelligence. This Court has acknowledged as much, holding that "the FRA treats 'the law enforcement authority of the United States [as] a key weapon in assuring record preservation and recovery,' such that a suit would be moot only if there are no more 'imaginable' avenues for the Attorney General to pursue." *Judicial Watch, Inc. v. Tillerson*, 293 F. Supp. 3d 33, 41 (D.D.C. 2017) (quoting *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 956 (D.C. Cir. 2016)). Yet the declarations of Defendants' representatives are silent as to the steps—likely none—that Defendants and their agencies have taken to retrieve, or even attempt to retrieve, any improperly deleted Signal messages for purposes of complying with their FRA obligations.

As stated in American Oversight's opening brief, Defendants admit to using Signal to discuss myriad other subjects related to their government business. Pl.'s Br. Supp. Mot. Prelim. Inj. 8, ECF No. 19-1. For any extant, not-yet-deleted Signal chats, there is a "substantial likelihood that records will be recovered" through enforcement action to ensure that Defendants back up any Signal messages subject to an autodelete policy on their respective agencies' email servers. *See ACLU Found. of Fla. v. U.S. Immig. & Customs Enf't*, No. 22-cv-01129 (CJN), 2023 WL 6461053, at *6 (D.D.C. Aug. 31, 2023) (internal quotations omitted); *see also* Pl.'s Br. Supp. Mot. Prelim. Inj. 28–29, ECF No. 19-1. This district has previously recognized that there can be a substantial

likelihood of recovering records by initiating an enforcement action under 44 U.S.C. § 3106 where, as here, government defendants have "never once contacted [the application vendor] themselves," could "enlist[] the Attorney General's coercive power" to "shak[e] the tree harder," and have had past success using "forensic techniques" to recover records "that others had believed to be deleted or unrecoverable." *See Cause of Action Inst. v. Tillerson*, 285 F. Supp. 3d 201, 208–09 (D.D.C. 2018) (cleaned up).

Furthermore, recovery of any improperly deleted messages is just one form of relief that American Oversight seeks. This Court may also redress the harm that Defendants have inflicted on American Oversight by granting declaratory relief and ruling "that the agency-head Defendants' practice of permitting the automatic destruction of Signal messages is arbitrary, capricious, and contrary to law" and "that the agency-head Defendants have violated their respective duties under the FRA and APA." Am. Compl. Prayer for Relief ¶¶ 3, 6, ECF No. 17.

Defendants did not even attempt to rebut American Oversight's claims with respect to Rubio in his capacity as Acting Archivist. *See* Am. Compl. Counts V–VI, ECF No. 17. Separate from his and the other agency-head Defendants' obligations under 44 U.S.C. § 3106(a), the Archivist has a unique duty to notify the Attorney General of any unlawful removal or destruction of records when the relevant agency heads fail to initiate the requisite enforcement action. 44 U.S.C. § 3106(b); *Price v. U.S. Dep't of Justice*, No. 18-cv-1339 (CRC), 2019 WL 2526439, at *6 (D.D.C. June 19, 2019) (explaining that a plaintiff "must make a clear showing . . . that the relevant agency head . . . and/or Archivist knew about the FRA violations and yet failed to initiate corrective action"). Here, as a participant in the Houthi PC Small Group chat—and, as discussed above, other Signal chats within the scope of American Oversight's pending FOIA requests and

Amended Complaint—Defendant Rubio was aware of the FRA violations or impending violations and yet took no corrective action as Acting Archivist.

American Oversight has demonstrated that it is likely to succeed on the merits of its claims against Defendants for failing to initiate enforcement action under 44 U.S.C. § 3106.

## III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST REQUIRE INJUNCTIVE RELIEF.

Defendants put forth little effort to assure the public that the near-total loss of the Houthi PC Small Group Chat was an isolated mistake. Defs.' Resp. Pl.'s Mot. Prelim. Inj. 21–22, ECF No. 22. They also offer no assurances that their use of—and failure to preserve—Signal messages is not as pervasive as has been reported. *Id.* "There is generally no public interest in the perpetuation of unlawful agency action," and there is "substantial public interest in having governmental agencies abide by the federal laws that govern their operations." *Becerra*, 2024 WL 3741402, at *16 (cleaned up, internal quotes omitted). The overwhelming weight of evidence shows not only that Defendants have used and continue to use Signal outside the reach of agencies' preservation regulations, but also that Defendants do not intend to change course. No Defendant has claimed that they had taken steps to preserve the entirety of the Houthi PC Small Group Chat before American Oversight sued them. This lawsuit and the Court's March 27, 2025 Minute Order prompted those efforts. The public interest requires the same protections now, in light of recent, ongoing revelations about the agency-head Defendants' pervasive, unregulated use of Signal for government business. Accordingly, the public interest and balance of hardships weighs in American Oversight's favor to stop the perpetuation of unlawful agency action.

## IV.    THE COURT SHOULD NOT REQUIRE A BOND.

The Court should not order any security amount from Plaintiff because a preliminary injunction will serve to protect the public's future access to federal records and will not materially

damage Defendants. The Court's "broad discretion" to set a bond amount under Rule 65(c) "includes discretion not only to set the amount of security but to dispense with any security requirement whatsoever where the restraint will do the defendant no material damage." *Assoc. Press v. Budowich*, No. 25-cv-00532 (TNM), 2025 WL 1039572, at *19 (D.D.C. Apr. 8, 2025) (internal quotes omitted). Defendants do not identify any specific costs they will incur if an injunction issues and they have not otherwise identified any way that they will be materially damaged by preserving records that they are statutorily required to safeguard. Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. 22, ECF No. 22; *see also* 44 U.S.C. § 3105. Defendants have already been faced with a court order to preserve some records in this case, *see* Min. Order (Mar. 27, 2025), and they do not argue that they sustained material damage as a result of that order. Accordingly, the Court should allow this case to proceed without a bond.

## CONCLUSION

Based on the foregoing and all other materials in the record, American Oversight respectfully requests that the Court grant its motion for a preliminary injunction.

Dated: May 14, 2025

Respectfully submitted,

*/s/ Benjamin A. Sparks*
Benjamin A. Sparks
D.C. Bar No. 90020649
Ronald A. Fein
D.C. Bar No. 90026641
Katherine M. Anthony
D.C. Bar No. 1630524
Emma Lewis
D.C. Bar No. 144574

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 873-1741
ben.sparks@americanoversight.org
ron.fein@americanoversight.org

22

katherine.anthony@americanoversight.org
emma.lewis@americanoversight.org
*Counsel for Plaintiff*