```
1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3    American Oversight,              )  Civil Action
                                      )  No. 25-cv-883
4                    Plaintiff,       )
                                      )  MOTION HEARING
5    vs.                              )
                                      )  Washington, DC
6    Peter B. Hegseth, et al.,        )  May 16, 2025
                                      )  Time:  2:00 p.m.
7                    Defendants.      )
     _____
8
                     TRANSCRIPT OF MOTION HEARING
9                         HELD BEFORE
             THE HONORABLE JUDGE JAMES E. BOASBERG
10                  UNITED STATES DISTRICT JUDGE

11   _____

                        A P P E A R A N C E S
12
     For Plaintiff:      Benjamin A. Sparks
13                       Emma Lewis
                         1030 15th Street NW
14                       Suite B255
                         Washington, DC  20005
15                       Email:  Ben.sparks@americanoversight.org
                         Email:  Emma.lewis@americanoversight.org
16

17   For Defendants:     Amber Richer
                         U.S. Department of Justice
18                       1100 L Street NW
                         Washington, DC  20005
19                       Email:  Amber.richer@usdoj.gov

20   _____

21   Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                             Official Court Reporter
22                           United States Courthouse, Room 6523
                             333 Constitution Avenue, NW
23                           Washington, DC  20001
                             202-354-3267
24

25
```

```
 1      *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
 2              THE COURT:  Okay.  Good afternoon, everyone.
 3              THE COURTROOM DEPUTY:  Good afternoon, Your Honor.
 4      We are here today for a motion hearing in civil action 25-883,
 5      American Oversight versus Peter Hegseth, et al.
 6              Beginning with counsel for the plaintiff, if you
 7      could please approach the lectern and identify yourself for the
 8      record.
 9              MR. SPARKS:  Good afternoon, Your Honor.  Ben Sparks
10      appearing on behalf of plaintiff American Oversight.  And with
11      me at counsel table is Emma Lewis.
12              THE COURT:  Welcome to you both.
13              MS. RICHER:  Good afternoon, Your Honor.  My name is
14      Amber Richer.  I'm with the U.S. Department of Justice,
15      appearing for the defendants.  And I am joined at counsel table
16      by Marcie Berman.
17              THE COURT:  Okay.  Thank you.  Nice to see you both.
18              And I take it the public line is connected.
19              THE COURTROOM DEPUTY:  Yes.
20              THE COURT:  So we're here today for a preliminary
21      injunction.  So, Mr. Sparks, why don't you begin?
22              And, so, I think much of the conduct that you discuss
23      is certainly concerning to me.  What I think is harder are the
24      legal issues, which I don't feel the briefs spent quite as much
25      time on, so maybe you can help me in a couple of places.
```

1              So, if we break out the relief that you are seeking,

2      in other words, what you want me to enjoin, into three, one

3      being to order agency head, defendants to implement adequate

4      recordkeeping programs; two is to order the defendants to

5      preserve materials; and then three is ordering them to comply

6      with initiation and notification procedures.

7              So let's talk about materials, first.  And I guess

8      what I'm wondering about is, is this a remedy that is available

9      to you if you prevail?  So let's take us out of the preliminary

10     injunction posture.  Say you're moving for summary judgment and

11     I find -- and I find that the recordkeeping is inadequate.  Is

12     preservation a part of the remedy?  How is preservation part of

13     any remedy here?  I mean -- and I understand the desire to

14     freeze any destruction efforts, but in an APA case, which is

15     what this is, tell me how that's a remedy that you could

16     obtain, if you won the case.

17             MR. SPARKS:  Thank you, Judge.  In terms of

18     preservation, I think it would essentially flow from the

19     Court's finding that recordkeeping policies are inadequate or

20     arbitrary and capricious such that they be, you know, changed

21     or improved to preserve those federal records into the future.

22     So that's kind of what we're talking about with preservation.

23             THE COURT:  Right, going forward.

24             MR. SPARKS:  Well, correct.  And I suppose to

25     preserve ones that are not being preserved and are at risk of

1    being lost currently.  Presumably, any new recordkeeping

2    policies that are put in place after a finding that the current

3    policies are unlawful, that would scoop up those existing

4    records that are currently not protected under current

5    recordkeeping policies.

6         THE COURT:  Right.  But have you found any case in

7    which that's been a remedy, whether preliminary injunction or

8    not?

9         MR. SPARKS:  Outside of the preliminary injunction

10   context, I can't say that I've seen a case like that, Judge.

11        THE COURT:  But even in a PI context?

12        MR. SPARKS:  In a PI context, Your Honor, I

13   believe -- if you would allow me to step back to counsel table

14   real fast to grab some materials.

15        THE COURT:  Sure.  Maybe it's the Judge Contreras's

16   case --

17        MR. SPARKS:  The *Becerra* case, Your Honor, is what

18   I'm thinking of.

19        THE COURT:  Is that *America -- America First*, *America*

20   *First Legal*.

21        MR. SPARKS:  So, preliminary injunction was issued in

22   that case, Judge.  I can give you a quick gist of the facts,

23   although I presume you're familar with the case already.  As I

24   understand it, the ruling and the finding in this case, the

25   CDC's guidelines were permitting the destruction of low-level,

1    non-capstone employees' emails, basically in contravention of

2    the written policy that was in place, in terms of the PI that

3    was issued, I believe.

4        THE COURT:  I think you're right, but I'm just

5    wondering what the basis of it was.  In other words, go back

6    with me to my initial question, which is if you won the case

7    and I said judgment in your favor, they have to implement new

8    recordkeeping policies.  What authority would permit me to say:

9    And until you do so -- or, and all documents that existed

10   prior -- or, that currently exist prior to the implementation

11   of such policy need to be preserved?

12        MR. SPARKS:  Well, what we're talking about, the

13   records are a specific category of records in this case.  These

14   are communications by the heads of five agencies.  My

15   understanding is that simply by virtue of who these people are,

16   these are subject to permanent retention, to the extent that

17   they, you know, deal with government business.  So any new

18   recordkeeping policy that would have to be put in place,

19   approved by NARA, would have to be compliant with the FRA.

20   That, in effect, would have to capture these records that are

21   subject to permanent -- or, yeah, permanent disposition

22   schedules, essentially.

23        So I suppose it's sort of a roundabout way of saying

24   not that you would be ordering preservation, you know, by

25   letter, but in effect this would preserve records that should

1    be preserved indefinitely, again, by virtue of the fact that

2    these are communications by the highest people in five

3    executive agencies.

4        THE COURT:  So we look at that issue of the

5    recordkeeping policies.  So they say, defense say, we have

6    these policies.  And it seems that your response can be one

7    of -- is one of two things, and then you can tell me -- or

8    maybe it's both -- that one is, well, we're not talking about

9    agency policies, we're talking about cabinet-level policies

10   that these people participate in as one, or those policies

11   aren't good enough.  So is your argument both or which?

12       MR. SPARKS:  Both.  And I'll start with the informal

13   policies.  And I think the *Becerra* case can be instructive in

14   this instance.  And just for the record, this is 224 WL

15   3741402, *American First Legal Foundation versus Becerra*, an

16   unpublished case from 2024.  And, Judge, again I'll spare you

17   the factual recitation of that case and just go to what I think

18   is an instructive, you know, part of the reasoning at page 11.

19       Quote:  Refined to bare essence, plaintiff alleges

20   that CDC enacted and obtained NARA's approval to use one

21   recordkeeping policy and disposition schedule to govern

22   retention of its employees' emails.  And then it cites to GRS

23   6.1.  But then, turn around and use some other, quote, unknown,

24   unpublished policy, citing the complaint at paragraph 44, that

25   sets forth different requirements than GRS 6.1, and pursuant to

1    which the agency deletes former employees' emails on a much

2    shorter timeframe than those established by GRS 6.1.

3                THE COURT:  Right.  So that's talking about that CDC

4    had such a policy, right?

5                MR. SPARKS:  Correct.  Correct.

6                THE COURT:  But you're not arguing any of the

7    agencies have such a policy, right?

8                MR. SPARKS:  To get back to your initial question

9    about whether we're going after -- or, looking at the written

10   policies versus this informal policy, kind of talking about

11   establishing this informal policy, that these can coexist at

12   the same time.  So in that *Becerra* case, NARA actually

13   investigated the written policies of CDC and declined to take

14   any enforcement action on them.  In the case, the Court found

15   that this unknown, unpublished policy by which they were

16   operating, contrary to that written policy, constituted a

17   pattern or practice that was unlawful under the FRA.

18               THE COURT:  Sure.  And I understand that it doesn't

19   just have to be a written policy, it can be a practice.

20   Completely understand.  But isn't the difference here that

21   these -- this is not a practice within the agency, this is just

22   something that you're saying that the head of different

23   agencies is doing?

24               MR. SPARKS:  Well, yeah, I suppose the head/ultimate

25   authority on the recordkeeping programs for these agencies,

1   these are policymakers that we're talking about, statutorily,

2   and so these folks are engaging in a practice, as we allege, of

3   both creating Signal messages and then losing those Signal

4   messages with regularity that are separate and apart from the

5   written policies that we saw, you know, cited in the briefs.

6        THE COURT:  But there's not an agency-wide problem,

7   right?  It's the fact that -- so why isn't this more akin to a

8   situation where there -- there's a violation of the policy, as

9   opposed to a separate practice?

10       MR. SPARKS:  Yeah, so two points.  The first is in

11  *Becerra*, that wasn't necessarily an agency-wide problem either.

12  We were talking about just non-capstone employees' emails being

13  deleted at an inappropriate time.  That was the, you know,

14  unpublished policy at issue there.  So I don't know that it

15  needs to be a policy that affects literally every person in the

16  agency.  Right?

17       But that being said, these are, again, the policy-

18  makers of the agency.  Simply by the way that they've responded

19  to our lawsuit, Judge, they're setting an example and, you

20  know, showing their agency members the efficacy of the written

21  policy that's in place.  This is sort of a top-down type of

22  practice that's taking place.

23       It's true that we have not seen reports and don't

24  have, you know, direct evidence that every single person in

25  each of these agencies is using Signal and deleting those

1    messages with regularity, but we do have that information about

2    the people who are tasked by statute with putting the

3    recordkeeping management programs in place.

4              THE COURT:  But I guess -- so if you have a spectrum

5    of the whole agency has a practice, clearly that falls within

6    the ambit of the case law.  One employee who does something is

7    clearly on the other side of the line because that's just a

8    violation.  Seems to me that the *Becerra* case is closer to the

9    former in that you've got a category of employees who are doing

10   something.

11             And so your argument, which I think is your best

12   argument, is it's not just one employee, it's the head of the

13   agency.  The question, though, is does that get you on the

14   right side of the line?

15             MR. SPARKS:  Well, I will say, this is uncharted

16   territory, I think.  I don't know that we've seen a practice

17   this consistent among this many agency heads that appear to be

18   this unlawful.

19             THE COURT:  And then, so, getting back to the

20   original question that asked, and you said both, so that was

21   one prong of it.  The second prong would be that people -- that

22   different -- we have sort of a cabinet-level violations.  But,

23   although, certainly unexpected to the authors of the

24   legislation.  The legislation -- the statute really talks about

25   an agency head.  And so how do we extrapolate the sort of

1    cabinet-wide violation?  How do we plug that into the statute

2    to make it fit?

3              MR. SPARKS:  That's a fair question, Judge, and I'll

4    say, you know, when we're referring to cabinet-wide practice,

5    that's simply the easiest way to refer to this many people at

6    once.  What we're talking about are five separate agency

7    policies that are being established by five separate agency

8    heads, and I suppose it's a coincidence that they all happen to

9    have the same practices that they're abiding by.

10             THE COURT:  And then -- so, I think I know the

11   answer, but walk me through the irreparable harm on this

12   failure to implement adequate recordkeeping policies.

13             MR. SPARKS:  Yeah.  Thank you, Judge.  As we point

14   out in our brief, American Oversight has pending FOIAs with

15   each of these agencies seeking specifically Signal messages

16   sent by each agency head from the dates that they took office

17   through the date that the searches are conducted.  Those FOIAs

18   were sent on March 25th and they remain pending.

19             THE COURT:  So the argument is that if they don't

20   implement these policies, then documents will be destroyed,

21   which documents are subject to your FOIA requests and,

22   therefore, will never be produced?

23             MR. SPARKS:  Correct.  And as far as we've seen,

24   those documents have been destroyed, to be clear.  I know that

25   the *Atlantic* was able to capture some and I know White House

1    counsel's office was able to cobble together some pieces, but

2    there's no doubt that there have been records lost from that

3    initial Signal chat that kicked off this lawsuit.

4         THE COURT:  Let's move to the last form of relief,

5    which is enjoining the agency, head of the Archivist, to take

6    action.  And I think you blend that in your briefing.  But are

7    you -- which are you seeking me to enjoin under 3106(b), I

8    guess, or possibly 3106(a)?  Are you asking me to enjoin the

9    head of the agency to notify the Archivist, or are you asking

10   me to enjoin the Archivist to request the Attorney General to

11   initiate an action?

12        MR. SPARKS:  I think it's a twofold answer.  The

13   first, in terms of 3106(a), for the agency heads notifying the

14   Archivist to start -- well, strike that, Judge.  I'll start

15   with (b), 3106(b), the provision for the Archivist to notify

16   the AG.  Looking specifically just at the Houthi PC small group

17   chat, the Archivist was part of that chat and a participant, so

18   I don't think we need the first step of the agency heads going

19   to the Archivist.  I think the Archivist can go directly to the

20   Attorney General.

21        For other signal messages that we have learned have

22   been lost, for instance, *The Wall Street Journal* reported about

23   Secretary Hegseth having lost Signal messages.  That's an

24   instance where I believe the agency head would need an order to

25   notify the Archivist and then that initiation can proceed from

1    there.

2            THE COURT:  So, again, so when I read 3106(b), it

3    says:  In any case in which the head of a federal agency does

4    not initiate an action for such recovery or other redress

5    within a reasonable time -- within a reasonable period of time

6    or is participating or believed to be participating in the

7    unlawful action, then the Archivist shall request the Attorney

8    General to initiate the action.

9            So it would seem to me -- no one has addressed this

10   that I've seen -- that enjoining the agency is probably

11   inconsistent with the statute because there's a remedy if

12   the -- within the statute if the agency head doesn't act,

13   right?  In other words, there's no need to enjoin the agency

14   head because if the agency head -- because your argument is the

15   agency head is participating in this.

16           MR. SPARKS:  In the Houthi small group chat we know

17   they were all participants, that's correct.

18           THE COURT:  Therefore, if that's the case, then the

19   Archivist has a duty to act without any need for any court

20   injunction.  So it seems to me that the statute implies that if

21   there's going to be an injunction -- well, the statute doesn't

22   imply anything about that, but if there is going to be an

23   injunction, it would seem that the Archivist should be the

24   person enjoined.

25           MR. SPARKS:  As to 3106(b)?

1          THE COURT:  Correct.

2          MR. SPARKS:  I think that's right.  Specifically, as

3     we're talking about the Houthi small group chat, correct.  Yes.

4          THE COURT:  And then -- but so then, then here's my

5     other problem, which is:  So tell me about the irreparable harm

6     that you face from the Archivist's failure to request the

7     Attorney General to initiate an action.

8          MR. SPARKS:  Well, I'm going to admit that I don't

9     know a whole lot about Signal on a technical level, Judge, but

10    just common sense would dictate that as time passes, these

11    things are harder to recover.  And, so, time is of the essence

12    on some level, I have to assume, but that's --

13         THE COURT:  That's fair.  But how about the

14    attenuation issue?  In other words, to get a preliminary

15    injunction, irreparable harm has to be certain, impending, and

16    great.  Without any comment about current officeholders, what

17    likelihood do you think that the Attorney General initiates

18    such an action when -- if the Archivist is required to request

19    that she do so?  Because in order to be -- your damage to be

20    fairly certain, you have to show that she would initiate such

21    an action and that such action would succeed, right?

22         MR. SPARKS:  I hear your question, Judge.  I read the

23    statute differently.  I believe it's just a mandate for the

24    Archivist to notify the Attorney General.  I don't think I'm in

25    a position to speculate as to what the Attorney General may or

1    may not do with that information.  I just know that -- I

2    believe that the statute says that that's the step that needs

3    to be taken.

4         THE COURT:  I completely agree with you on that, but

5    that seems to be a merits question.  What I'm wondering, on

6    irreparable harm, don't you have to show me that absent such

7    mandate, your harm is certain?

8         MR. SPARKS:  Understood.  Yes.  And I guess I don't

9    have a strong answer for that.  I don't want to venture into

10   speculation, as I said.  And I'll reiterate, Judge, that the

11   thrust of the PI that we're seeking here is to protect these

12   records for the duration of litigation.  I think it's a

13   secondary issue, the initiation action for the PI, on the

14   merits, you know, obviously -- but, yeah.

15        THE COURT:  And then are you seeking to proceed under

16   2115 at all?  Which is, as you know, 2115(b) says when the

17   Archivist finds that a provision has been violated, the

18   Archivist shall inform, in writing, the head of the agency, and

19   so forth.  Or are you just seeking under -- to move under 3106,

20   which is the one we just talked about?

21        MR. SPARKS:  To be honest, Judge, I would have to go

22   back and look at my amended complaint.  I'm happy to do that,

23   if I can have a break for a second.

24        THE COURT:  I would doubt you're seeking to proceed

25   under 2115 --

1          MR. SPARKS:  I know for sure 3106, I can say that

2     with certainty.

3          THE COURT:  Let me talk with Ms. Richer and then I'll

4     return.  Thanks so much, Mr. Sparks.

5          MR. SPARKS:  Thank you, Your Honor.

6          THE COURT:  So, Miss Richer, this sort of seems an

7     unusual situation, where the Archivist himself is one of the

8     people arguably involved in the failure to preserve records.

9     And, so, where the Archivist is not an independent actor, which

10    is what the statute presumes, this gets a lot tricker, it

11    seems.  Fair?

12          MS. RICHER:  That may be possible, although I think,

13    as plaintiff just suggested, there is not a risk of irreparable

14    harm here.

15          THE COURT:  Because?  As to which piece of their

16    requested relief?

17          MS. RICHER:  Right.  So I think, as we've pointed out

18    in our opposition, plaintiff has not shown a substantial

19    likelihood of irreparable harm with respect to the 3106 claim.

20    And part of that, I would say -- so plaintiff says that the

21    primary concern here is preservation.  And I would also point

22    to the agency's declarations that were attached to the

23    opposition that show the efforts to preserve the chat that

24    plaintiff is concerned about.

25          And to the -- plaintiff has not put forth any direct

1    evidence of -- I think as plaintiff has acknowledged, plaintiff

2    has not put forth any direct evidence of any other concerns

3    about compliance in terms of -- so, and I should say also, to

4    clarify, the Federal Records Act, 44 U.S.C. 2911(a), does not

5    prohibit the use of electronic messaging apps such as Signal.

6    So consistent with that provision in the statute, the agency

7    policies also, likewise, do not prohibit the use of electronic

8    messaging.

9          THE COURT:  As long as it's preserved, right?

10          MS. RICHER:  There are certain conditions for the use

11    and preservation, correct.

12          THE COURT:  But you're not saying that the FRA

13    permits the use of Signal to the extent that messages get

14    deleted and aren't preserved; that wouldn't be compliant,

15    right?

16          MS. RICHER:  There are certain preservation

17    requirements, that's correct.

18          THE COURT:  So let me ask some of the questions that

19    I talked to Mr. Sparks about.  So, you know, the first issue I

20    raised with him, so do you think that preservation is a

21    remedy -- is an available remedy under the FRA?

22          MS. RICHER:  So I think this comes back to the point

23    that plaintiff is essentially raising compliance-related

24    claims, which are not subject to judicial review under the

25    Federal Records Act.  And I think to address some of the

1    questions that Your Honor posed to my opposing counsel, that

2    plaintiff fails to distinguish the *CREW versus Pompeo* case

3    which we relied upon in our opposition.  And among other

4    things, that case recognizes that a policy or practice claim

5    fails when it relies upon the actions of nonagency employees.

6          So here, plaintiffs have not shown deficiencies in

7    each agency's policy.  They are relying upon generalized, often

8    undifferentiated allegations and collective inferences about a

9    pervasive informal policy across the agencies.

10          THE COURT:  It seems -- and I respect that as an oral

11    advocate that you have points you want to make, but seems

12    you're not really answering my question there.  So can you --

13    what's your position on whether preservation is a remedy they

14    can even seek here?

15          MS. RICHER:  The -- our position is that the relief

16    that they can seek is limited to challenging the agency

17    preservation guidelines, and so -- and on that point, I think

18    that --

19          THE COURT:  So let's say -- let's take a hypothetical

20    that the guidelines were clearly inadequate or they were --

21    that you admitted -- or, that I found they were clearly

22    inadequate.  So you would agree, first, that I could enjoin you

23    to promulgate compliant regulations, right?

24          MS. RICHER:  I believe that's correct, Your Honor.

25          THE COURT:  And how about preserving records that

1    were subject to the noncompliance regulations?

2            MS. RICHER:  Well, I think plaintiff here has not

3    shown a lack of preservation --

4            THE COURT:  No, no.  I understand that's your

5    position, but mine is a more fundamental question, which is:

6    Could they -- can they seek preservation?  I mean, maybe you're

7    saying they can, but --

8            MS. RICHER:  No, I think -- what I'm trying to say is

9    that claims under the Federal Records Act, as the Court has

10   recognized, are limited to challenges to agency guidelines and

11   also the -- you know, the enforcement.

12           THE COURT:  Sure.  And one of their claims here is to

13   the guidelines; fair?

14           MS. RICHER:  We do not believe that they have raised

15   timely allegations challenging the specifics of the guidelines.

16           THE COURT:  Really?  Why not.

17           MS. RICHER:  Because in the amended complaint the --

18   as we pointed out in our opposition, the plaintiff does not

19   identify any specific deficiencies in any of the agency's

20   written policies.

21           THE COURT:  Okay.  Sure.  But they're saying that you

22   have practices that are separate and apart from the written

23   guidelines that are noncompliant.  And you would agree with me

24   that if you have compliant written guidelines, but that people

25   don't follow them and there's some widespread practice in an

1    agency of not following the guidelines and acting in ways that

2    are contrary to the guidelines, someone could challenge that?

3            MS. RICHER:  Well, I think that it's the rare case in

4    which the Court has found or recognized a policy or practice

5    claim under the Federal Records Act.  The notable case here is

6    *CREW versus Pruitt*, and that case involved a much higher

7    standard for showing a policy of not creating records.  So in

8    that case, as we pointed out in our opposition starting at page

9    17, which laid out the detailed factual allegations from *CREW*

10   *versus Pruitt*, that the court found sufficient, if true, to

11   survive a motion to dismiss on a pattern or practice.

12           THE COURT:  Right.  No, I remember.  That was my

13   case, so I remember that.  But --

14           MS. RICHER:  So in that case there was a much

15   stronger showing of culture of secrecy, verbally instructing

16   staff not to create a written record, prohibiting note taking,

17   using a different telephone, avoiding email, commissioning a

18   sound-proof privacy booth.  Those are the types of specific

19   allegations that plaintiff does not set forth here.  So --

20           THE COURT:  Sure.  But I think you're answering my

21   question, which is that in a circumstance like *Pruitt*, where

22   there are practices that go against written policies, but that

23   are sufficiently widespread to constitute policies and

24   practice, that would be a violation of the FRA; fair?

25           MS. RICHER:  I think that it's -- it's a rare

```
1     situation where a plaintiff --

2               THE COURT:  I'm with you, but my hypothetical is

3     assume the rare situation.  So assuming --

4               MS. RICHER:  Your Honor, can I just have a minute?

5               THE COURT:  Of course.  Of course.

6               (Off-the-record discussion between defense counsel.)

7               MS. RICHER:  So, Your Honor, we understand that

8     that -- the policy or practice claim has been recognized in

9     some cases, like CREW versus Pruitt or CREW versus Pompeo, yes.

10    We just think that that type of claim is not consistent with

11    the Armstrong line of cases and the sort of circumscribing of

12    the Federal Records Act, judicial review.

13              THE COURT:  I'm not asking this rhetorically:  So

14    your position is that I was wrong, then, in finding that in

15    both of those cases?

16              MS. RICHER:  I think we disagree with the policy or

17    practice.

18              THE COURT:  And again, you're perfectly -- I will

19    take no offense.  You can say that the government's position is

20    that I was wrong.  They've said that before.  So is what you're

21    saying -- is your position that there is -- that a policy and

22    practice claim is simply unavailable under the FRA?

23              MS. RICHER:  Yes, that's correct.  And even if it

24    were, that they have not met the standard.

25              THE COURT:  Sure.  And I understand that.  I
```

1    understand your position there on that.  But, so -- but, my

2    initial question was a little more fundamental.  Let's say the

3    policies are clearly insufficient, the written policies.  And

4    so a remedy for a plaintiff who successfully showed that would

5    be for the Court to say you must rewrite your policies, such

6    that they're compliant.  Right?

7         MS. RICHER:  Correct.

8         THE COURT:  Okay.  So my question, though, is -- get

9    back to what we were asking originally, is preservation of

10   records pending such rewriting an available remedy?

11        MS. RICHER:  I think, on the merits of a Federal

12   Records Act claim, the relief would be limited to the policy

13   guidelines.

14        THE COURT:  All right.  So that's the question.

15   Okay?  So that's your position on that.  So then, on -- and so,

16   so what's -- tell me your thoughts then on Mr. Sparks' claim

17   regarding this cabinet-wide practice.  So let's say each of the

18   agencies has a policy that's appropriate, but that the heads

19   are all violating it because there's some cabinet-wide policy

20   that we're going to circumvent these rules.  So why shouldn't

21   the plaintiffs have some availability for relief here, given

22   that we're talking about the highest actors in government?

23        MS. RICHER:  I think this comes back to the point,

24   for instance, in *CREW versus Pompeo* where the plaintiffs tried

25   to show, similarly, an administration-wide recordkeeping

1    failure.  The plaintiff here is challenging each agency's

2    policy, so they have to show that each agency's policy is

3    inadequate.  And they are relying, instead, upon sort of

4    generalized inferences and it's -- you know, as I said, it's --

5    there have been cases that have also similarly involved high-

6    level officials, and *CREW versus Pompeo* is one, and where the

7    Court found that the plaintiff failed to make out a claim of a

8    policy or practice.

9         THE COURT:  Yes, but that -- and that was also my

10    case, so I remember it.  But that didn't allege that this was a

11    widespread practice among multiple agency heads, so which --

12    why shouldn't that be more concerning and lead to some remedy?

13         MS. RICHER:  Well, I think the fundamental logic

14    there was that much -- as the Court said, as the Court is

15    familiar, much of the complaint contains allegations regarding

16    officials who are either not members of the state department or

17    not subject to the FRA at all.

18         THE COURT:  Actually, slow down.

19         MS. RICHER:  Apologies.  I'll slow down.

20         And such allegations do not implicate the adequacy of

21    the agency's recordkeeping policies.  So in other words, I

22    think that the logic there is that the agency's policies cannot

23    be demonstrated by nonagency personnel.

24         THE COURT:  Okay.  And then what about, sort of, the

25    Archivist, why can't -- if I find that there's been a

1    sufficient showing that there's been a deletion of records, why

2    can't I enjoin the Archivist to request the Attorney General to

3    initiate an action to recover under 3106(b)?

4            MS. RICHER:  Sorry.  Just so I understand the

5    question, the question is if the Court were to find sufficient

6    evidence of deletion, why can't the Court order referral?

7            THE COURT:  Right.  Why can't I order that the

8    Archivist request the Attorney General to initiate an action?

9            MS. RICHER:  I think we address this in our

10   opposition.  The plaintiff's burden is to show substantial

11   likelihood of redressability and they have not shown that here.

12   And, again, you know, I think it is also relevant that the

13   agencies have already preserved the consolidated version of the

14   chat in agency recordkeeping systems.

15           THE COURT:  But if I found that they had not, is

16   there anything that would prevent me or should prevent me from

17   mandating that the Archivist request the Attorney General to

18   initiate the action?

19           MS. RICHER:  I think that the plaintiff has not shown

20   substantial likelihood of redressability.

21           THE COURT:  Is this -- sounds like a standing

22   argument, is that what you're making?

23           MS. RICHER:  Um --

24           THE COURT:  Or are you making irreparable harm

25   argument?

```
 1              MS. RICHER:  One moment, Your Honor.

 2              THE COURT:  Take your time.

 3              (Pause.)

 4              MS. RICHER:  So, I'm referring to a case that we

 5     cited starting on page 20 of our opposition, the ACLU

 6     Foundation versus U.S. Immigrations and Customs Enforcement.

 7     So, essentially says that, you know, that the plaintiff has to

 8     show that the -- there is some likelihood, substantial

 9     likelihood of a remedy or of recovery.  And plaintiff has not

10     shown that here.  In fact, plaintiff --

11              THE COURT:  In what context?

12              MS. RICHER:  In the context -- so if the Court were

13     to find -- I think the premise of the question was, if the

14     Court finds a showing that the records have been -- are lost,

15     can the Court order the referral?  And so, what plaintiff here

16     has not shown is that there's a substantial -- and I think

17     plaintiff has admitted this -- plaintiff has not shown that

18     there's a substantial likelihood that records could be

19     recovered.

20              THE COURT:  But that, you think -- that, you're

21     saying, is sort of a standing question?  In other words,

22     there's not an injury?  Or do you want to make that as an

23     irreparable harm argument?  Which, again, is a higher burden

24     for the plaintiff than mere standing, right?

25              MS. RICHER:  Right.  I think it's both.  And I also,
```

1    as we've -- yeah, I think it's both.

2           THE COURT:  And so tell me why it's not -- why

3    they're unlikely to obtain relief?

4           MS. RICHER:  Well, I think, sort of, as we've shown,

5    you know, plaintiff -- plaintiff's own allegations are that --

6    as we discussed on page 21 of our opposition, plaintiff's own

7    allegations are that they don't believe the records are

8    recoverable.  So plaintiff really has not shown that they would

9    be recoverable.

10          THE COURT:  Okay.  All right.  Thank you very much.

11          I'll talk to Mr. Sparks for a few more minutes.

12          So, Mr. Sparks, so let's start where Ms. Richer left

13   off, with this idea that it's not redressable, or even if we

14   made it -- if we placed it into the irreparable harm context,

15   it's not just what I was focusing on, which was how do we know

16   the Attorney General is going to do anything?  But what she's

17   focusing on is:  How do you know the Attorney General is going

18   to obtain anything, even if she doesn't?  Do you have a

19   response to that?

20          MR. SPARKS:  The statute doesn't say the Archivist

21   shall notify the Attorney General unless it seems like maybe

22   they can't get these records back because it's difficult or

23   they don't have a good shot at it, Judge.  It's a mandate by

24   statute.

25          THE COURT:  Sure.  But, there wouldn't be irreparable

1    harm if this was going to be futile?

2          MR. SPARKS:  We don't know unless the Attorney

3    General tries, I think, is one thing.  You know, there's a

4    presumption -- the plaintiff is being accused of having a

5    presumption that these records are recoverable.  There's a

6    presumption on the other side that the records are not

7    recoverable at all under any circumstances.  And certainly,

8    with the power of the U.S. Federal Government behind the AG,

9    the best chance of getting them back would be that route.

10          I would also say, Judge, that in terms of irreparable

11   harm, if the mandate of the statute is not followed, I'm not

12   sure what precedent that sets in the future for other

13   litigants, other FOIA requesters similarly situated to American

14   Oversight who would seek these records.  And, you know, I would

15   hate for a decision to be cited that says, well, it seemed like

16   it wasn't redressable in the preliminary injunction context

17   because it seemed like there was little chance that the AG

18   could actually recover those records.  That holding could be

19   misused, I think, in future contexts.

20          THE COURT:  I think that's a good point, but isn't

21   the irreparable harm analysis in a preliminary injunction

22   somewhat different from whether they're redressable at all in

23   an ordinary merits analysis?

24          MR. SPARKS:  It's true, Judge.  And, you know, I'll

25   give you that the preservation is the imminent serious part of

1    this motion, in the context of the preliminary injunction

2    motion, when compared to that initiation of action under 3106.

3    On the merits, you know, we can talk about that.  But in the

4    context of the preliminary injunction, yeah.

5            THE COURT:  And were you able to check whether you

6    are bringing a 2115 claim?

7            MR. SPARKS:  I did not see that cited in our amended

8    complaint.

9            THE COURT:  Again, I'm not sure why you would

10   necessarily bring one here, but I wanted to confirm.

11           Then I'll just give you a couple of minutes, if

12   there's anything else that Ms. Richer said that you would like

13   to respond to, or something else you might want to respond to

14   my questions when you've sat down.  Go ahead.

15           MR. SPARKS:  Fair.  Judge, just a few remaining

16   points.  The first, you know, it was mentioned that it's a rare

17   situation where a pattern and practice has been found in the

18   FRA contest.  You, being one of the judges that has found it,

19   know that, obviously.  But this is a rare case, these are rare

20   circumstances that we're talking about and a rare factual

21   situation.  So I would submit that to the extent there are rare

22   cases where a pattern or practice is found, this is one of

23   those cases.

24           I also heard the phrase, "Preserved a consolidated

25   version" in reference to the Houthi PC small group chat.  I

1    just want to say that, you know, the defense and the plaintiff

2    seem to speak different languages whenever it comes to this.

3    That, to me, is another way of saying we lost records.  And

4    what's that happened there, just to make sure the record is

5    clear on that.

6         To the extent there are any further questions that

7    the Court has, I'm happy to answer those.

8         THE COURT:  No, I think that's it.  As I said when I

9    started, I think there's some tricky legal issues.  The factual

10   conduct is concerning to me and the question is whether legal

11   redress exists.  I'm wondering, if you brought a FOIA claim,

12   sought an injunction to preserve records on the ground that we

13   can't get our documents if you destroy them, whether or not

14   you're following any written policy or practice.  I wonder

15   whether that's the appropriate legal route to go, as opposed to

16   an FRA where the question is:  Is preservation a remedy at all?

17        So, again, I'm not telling you what to do or giving

18   you legal advice, I'm just puzzling through these issues

19   myself.

20        But, okay.  Thank you so much, everybody.  Have a

21   nice weekend and I'll try to figure this out.

22                        *   *   *

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4          I, JANICE DICKMAN, do hereby certify that the above

5   and foregoing constitutes a true and accurate transcript of my

6   stenograph notes and is a full, true and complete transcript of

7   the proceedings to the best of my ability.

8                    Dated this 22nd day of May, 2025.

9

10

11                    /s/_____

12                    Janice E. Dickman, CRR, RMR
                      Official Court Reporter
13                    Room 6523
                      333 Constitution Avenue NW
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25