**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN OVERSIGHT,

    Plaintiff,

       v.                                                    Civil Action No. 25-883 (JEB)

PETE HEGSETH, *et al.*,

    Defendants.

## <u>MEMORANDUM OPINION</u>

Concerned that disappearing messages might erase decisions of national consequence from the public record, Plaintiff American Oversight challenges the use of the Signal application by executive-branch officials to conduct government business. Plaintiff argues that communicating via auto-deleting Signal messages violates the Federal Records Act, and it thus sues under the Administrative Procedure Act for injunctive and declaratory relief to preserve those messages. Defendants are the agency heads allegedly communicating in such a manner — Defense Secretary Pete Hegseth, Director of National Intelligence Tulsi Gabbard, Central Intelligence Agency Director John L. Ratcliffe, Treasury Secretary Scott Bessent, and Secretary of State Marco A. Rubio — as well as the National Archives and Records Administration and Rubio in his capacity as the acting Archivist.

American Oversight now moves for a preliminary injunction ordering agency-head Defendants to implement adequate recordkeeping policies within their agencies, requiring them to notify the Archivist of the unlawful records deletion, and enjoining the Archivist to request that the Attorney General initiate an action to recover auto-deleted messages. Plaintiff also asks

the Court to require all Defendants to preserve government Signal chats during the pendency of this litigation.  At this juncture, the Court largely denies American Oversight's slew of requests and will instead grant only narrower relief.  It concludes that Plaintiff has not shown that the agencies' recordkeeping programs are inadequate, that this Court can provide redress for already-deleted messages, or that record preservation is an available remedy in APA suits for FRA violations.  American Oversight has likely established, conversely, that notification of the Archivist and referral to the Attorney General as to not-yet-deleted communications are mandatory, and that ordering those modest actions is justified under the preliminary-injunction factors.  The Court will consequently grant in part and deny in part the Motion.

## I.    Background

### A.    Legal Background

The Federal Records Act of 1950 "governs the creation, management and disposal of federal records."  Armstrong v. Bush (Armstrong I), 924 F.2d 282, 284 (D.C. Cir. 1991); see also Citizens for Resp. & Ethics in Wash. v. Pruitt, 319 F. Supp. 3d 252, 256–58 (D.D.C. 2018); Citizens for Resp. & Ethics in Wash. v. Pompeo, 2020 WL 1667638, at *3–4 (D.D.C. Apr. 3, 2020).  To ensure "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," while "prevent[ing] the creation of unnecessary records," 44 U.S.C. § 2902, the Act dictates that agencies must "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency."  Id. § 3101.  The FRA ultimately ensures that agencies "strike a balance 'between developing efficient and effective records management, and the substantive need for Federal records.'"  Armstrong I, 924 F.2d at 292 (quoting S. Rep. No. 94-1326, at 2–3 (1976)).

The Archivist of the United States and agency heads play critical roles in implementing the FRA. The Archivist must "provide guidance and assistance" to the agencies, in part by creating general "standards, procedures, and guidelines with respect to records management." 44 U.S.C. § 2904. Pursuant to this authority, regulations specify what types of records agencies must create and maintain, as well as the requirements for agency recordkeeping policies. See 36 C.F.R. §§ 1222.22–1222.34 (2009). The Act also "authorizes the 'head of each Federal agency' to establish a 'records management program' and to define the extent to which documents are 'appropriate for preservation' as agency records." Kissinger v. Reps. Comm. for Freedom of Press, 445 U.S. 136, 147 (1980) (quoting 44 U.S.C. § 2901).

To police these requirements, the FRA mandates that agency heads "notify the Archivist of any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or destruction of records in the custody of the agency" and work with him to "initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed from that agency." 44 U.S.C. § 3106(a). If an agency head fails to initiate "an action for such recovery or redress . . . , or is participating in, or believed to be participating in[,] any such unlawful action," the Archivist is tasked with requesting that the Attorney General "initiate such an action[] and . . . notify[ing] the Congress when such a request has been made." Id. § 3106(b).

In the seminal case on the availability of APA-based challenges to the FRA, Armstrong I, 924 F.2d 282, the Circuit evaluated three possible claims: (1) where agency employees "destroy[] records in contravention of the [agency's] . . . recordkeeping guidelines and directives"; (2) where the agency fails to employ adequate recordkeeping guidelines and directives; and (3) where the agency head or Archivist refuses to seek the initiation of an

enforcement action by the Attorney General.  <u>Id.</u> at 291, 294–95.  It determined that the first was not judicially reviewable but that the APA provides a private right of action for the latter two. <u>Id.</u> at 293–95; <u>see also</u> <u>Pruitt</u>, 319 F. Supp. 3d at 257–58.

        B.       <u>Factual and Procedural Background</u>

       American Oversight is a nonpartisan, nonprofit entity that "educate[s] the public about the activities and operations of the federal government" to "promot[e] transparency in government . . . and ensur[e] the accountability of government officials."  ECF No. 17 (Am. Compl.), ¶ 22.  Plaintiff routinely submits Freedom of Information Act requests to the agencies implicated in this suit and did so in early 2025, seeking a range of records — including Signal messages — containing communications among DoD, State, Treasury, and other government actors.  <u>See, e.g.</u>, <u>id.</u>, ¶¶ 112, 114, 119–23, 129–30.

       After American Oversight learned about a Signal chat that took place in mid-March among senior Trump administration officials to coordinate military strikes in Yemen — the so-called "Houthi PC Small Group" — it filed suit under the APA for violations of the FRA to prevent the destruction of the chat and future Signal messages.  <u>See</u> ECF No. 1 (Compl.), ¶¶ 1–2, 28, 30–31, 40; Am. Compl., ¶ 2.  Plaintiff believed that the messages constituted federal records that were responsive to its FOIA requests but were set to be automatically deleted.  <u>See</u> Compl., ¶¶ 5–7, 37–38, 43, 61–62.  It named as Defendants all agency heads involved in the chat as well as NARA and Rubio in his Archivist capacity.  <u>Id.</u>, ¶¶ 8–15.  As relief, it asked the Court to declare the messages to be federal records governed by the FRA, find that Defendants' recordkeeping systems are inadequate, and mandate both that they preserve all relevant records and fulfill their notification and referral duties triggered by FRA violations.  <u>Id.</u> at 17–18.  The watchdog simultaneously filed a new round of FOIA requests, this time seeking all Signal

messages sent or received by the agency-head Defendants since Inauguration Day 2025.  See Am. Compl., ¶¶ 23, 113, 124, 131, 136, 141.

Fearing that the chats would be deleted before this suit could run its course, Plaintiff sought a Temporary Restraining Order requiring Defendants to "ensure the preservation of any federal records that were created between March 11 and March 15, 2025, regarding and including any messages that are or were contained in [the Houthi Chat]."  ECF No. 6 (TRO Mot.) at 2.  In response, the Government stated that "Defendants are taking steps to locate and preserve the [Houthi Chat]," ECF No. 8 (TRO Opp.) at 7, and provided two declarations establishing that the Treasury Department had already located and copied into a federal recordkeeping system a partial version of the chat and that DoD was working to do the same. See ECF Nos. 8-1 (Christopher Pilkerton Decl.) (Treasury); 8-2 (Gerald J. Dziecichowicz Decl.) (DoD).

At a hearing on the Motion, the Court brokered an agreement between the parties, which required Defendants to "promptly make best efforts to preserve all Signal communications from March 11-15, 2025," and provide declarations detailing the steps they had taken to do so.  See Minute Order of Mar. 27, 2025.  Four days later, DoD, ODNI, CIA, and State averred that each agency was working to preserve all available Signal chats then implicated in this suit.  See ECF Nos. 10-1 (David P. Bennett Decl.) (DoD); 10-2 (Gregory M. Koch Decl.) (ODNI); 10-3 (Hurley V. Blankenship Decl.) (CIA); 10-4 (Mallory D. Rogoff) (State).

Unsatisfied with these assurances, Plaintiff requested supplemental declarations from Defendants that would provide further specificity on their preservation efforts regarding the Houthi Chat and other Signal communications, see ECF No. 12 (Resp. to Status Report) at 7, which the Court then ordered.  See Minute Order of Apr. 10, 2025.  Such declarations were filed

shortly thereafter.  See ECF Nos. 15-1 (2d David P. Bennett Decl.) (DoD); 15-2 (Robert A.

Newton Decl.) (ODNI); 15-3 (2d Hurley V. Blankenship Decl.) (CIA); 15-4 (Timothy J. Kootz

Decl.) (State).  While Plaintiff was largely placated by these efforts, it still objected that CIA

Director Ratcliffe had failed to comply with the Court's Order, see ECF No. 16 (Pl.'s Supp.

Decls. Resp.) at 3, an assertion the Government denies.  See ECF No. 20 (Def.'s Supp. Decls.

Reply) at 1.

Around the same time, Plaintiff filed an Amended Complaint that maintained its focus on

the Houthi Chat but expanded its allegations and requested relief to encompass the preservation

of other Signal chats.  The next day, it also filed a Motion for a Preliminary Injunction, see ECF

No. 19 (P.I. Mot.), on which the Court held a hearing on May 16.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter

v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary

injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to

suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in

his favor, and [4] that an injunction is in the public interest."  Sherley v. Sebelius, 644 F.3d 388,

392 (D.C. Cir. 2011) (alterations in original) (quoting id. at 20).  "The moving party bears the

burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is

warranted."  Hosp. Staffing Sols., LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010)

(quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in Winter, courts weighed these factors on a

"sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a

weaker showing on another.  Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291–92

(D.C. Cir. 2009) (quoting <u>Davenport v. Int'l Bhd. of Teamsters</u>, 166 F.3d 356, 361 (D.C. Cir. 1999)).  Both before and after <u>Winter</u>, however, one thing is clear: a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion.  <u>Ark. Dairy Coop. Ass'n v. USDA</u>, 573 F.3d 815, 832 (D.C. Cir. 2009) (citing <u>Apotex, Inc. v. FDA</u>, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006)).  "The basis of injunctive relief," moreover, "has always been irreparable harm."  <u>Sampson v. Murray</u>, 415 U.S. 61, 88 (1974) (cleaned up) (quoting <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500, 506–07 (1959)).  The inability "to demonstrate that irreparable injury is likely in the absence of an injunction" will thus also defeat a motion.  <u>See Winter</u>, 555 U.S. at 22 (emphasis omitted).

## III.    Analysis

In seeking preliminary relief, Plaintiff echoes many of its original TRO requests.  It asks that the Court order agency-head Defendants to implement adequate recordkeeping systems within their respective agencies, require both agency-head Defendants and Archivist Rubio to comply with the FRA's notification, initiation, and referral requirements, and mandate that the Signal messages be preserved during this litigation.  <u>See</u> ECF No. 19-1 (P.I. Br.) at 6.  The Court takes these requests in turn, addressing the preliminary-injunction factors for each as appropriate.

### A.    Recordkeeping Systems

Asserting that the named agencies' recordkeeping systems do not comply with the FRA, Plaintiff first asks the Court to mandate that the agency-head Defendants implement adequate policies.  As previously explained, courts may entertain such requests.  <u>See</u> *supra* pp. 3–4.  Since courts assess both formal and informal recordkeeping policies, <u>see</u> <u>Pruitt</u>, 319 F. Supp. 3d at 258–60 (assessing both); <u>Armstrong I</u>, 924 F.2d at 296–97 (remanding to evaluate formal

policy); Pompeo, 2020 WL 1667638, at *5–6 (assessing informal policy), this analysis will focus

first on the formal policies of the agencies and then turn to their alleged informal practices.

       1.    *Official Policy*

Plaintiff initially alleges that agency-head Defendants have failed to establish formal

records-management policies within their agencies that prevent the unlawful removal of records.

See Am. Compl., ¶ 189.  Under the FRA, agencies must "establish and maintain" a

recordkeeping program that provides "effective controls over the creation[,] . . . maintenance[,]

and use of records in the conduct of current business" and that complies with the Act and

implementing NARA regulations.  See 44 U.S.C. § 3102.  To succeed on a claim alleging that

such agency policies violate the FRA, American Oversight must plausibly allege that the official

agency policies "permit the destruction of record material that should be

maintained."  Armstrong I, 924 F.2d at 297 (citing 5 U.S.C. § 706(2)(A)).  It has not done so.

Defendants, through declarations from agency officials and exhibits attached to their

Opposition, explain that each agency at issue has in fact established an FRA-compliant policy.

See ECF Nos. 22 (P.I. Opp.) at 4–6; 22-1 (State Dep't Policies); 22-2 (DoD Records Mgmt.

Program Instructions); 22-5 (2d Robert A. Newton Decl.), ¶ 4 & Att. A (ODNI Records Policy);

22-6 (Mary C. Williams Decl.), ¶ 6 & Att. A (CIA Records Policy); 22-4 (2d Christopher

Pilkerton Decl.), ¶¶ 3–4 & Att. A (Treasury Dep't Records Mgmt. Policy).  American Oversight

acknowledges the existence of these policies but asserts that their lack of specificity "invite[s]

agency heads to fill gaps with informal, unwritten policies that contravene the FRA."  ECF No.

23 (P.I. Reply) at 18; see id. at 14–18.  Specifically, the watchdog is troubled by Defendants'

"failure to craft policies to ensure that records are available to respond to FOIA requests," id. at

15, and the policies' lack of guidance on how to preserve non-email electronic records.  Id. at

15–16.

Yet each agency maintains a policy that details how employees must record any business

they conduct on third-party messaging applications.  The State Department's policy, for

example, states:

> Regardless of the circumstances, when non-Government
> eMessaging applications and platforms are used to conduct
> Department business, each individual Department user included in
> the group message must capture the records on official Department
> systems as follows: (1) Records must be copied or forwarded from
> the non-Government application or platform to the individual's own
> state.gov account at the time of transmission or within 20 calendar
> days of creation or receipt; (2) After successfully forwarding or
> copying, delete the message from the nongovernment messaging
> application when no longer needed for continuity or reference.

State Dep't Policies at 5–6; see also DoD Records Mgmt. Program Instructions at ECF p. 4 ("If a

DoD employee uses a non-official electronic messaging account, the employee must copy the

message to his or her official electronic messaging account when the record is first transmitted,

or must forward a complete copy of the record to their official electronic messaging account

within 20 days of the record's original creation or transmission . . . ."); Treasury Dep't Records

Mgmt. Policy at 24 ("Staff who use encrypted applications for Treasury business are required to

forward any Treasury-related messages to non-encrypted Treasury messaging systems within

twenty days."); ODNI Records Policy at 5 ("If circumstances require business be conducted on a

personal device, the records must be copied to the official government account when the record

is first transmitted or a complete copy of the record must be sent to the official government

account within 20 days of the original record's creation or transmission."); CIA Records Policy

at 4–7 ("If a non-official or personal account is used under an exceptional circumstance to

conduct Agency business, that record shall be preserved by: a.) Transferring a digital copy of the

record into an approved Agency recordkeeping system . . . or printing and scanning a copy of the record into an approved Agency recordkeeping system . . . or b.) Forwarding a complete copy of the electronic message and attachment(s) to an official government account . . . no later than 20 days after the original creation or transmission of the record.").

These policies do not allow for discretion in determining what should be recorded; rather, they apply to any message "used to conduct Department business" "[r]egardless of the circumstances." State Dep't Policies at 5; see also Treasury Dep't Records Mgmt. Policy at 24 ("Staff . . . are required to forward any Treasury-related messages to non-encrypted Treasury messaging systems . . . .") (emphasis added); ODNI Records Policy at 5 ("If circumstances require business be conducted on a personal device, the records must be copied . . . .") (emphasis added). This means that messages concerning any Government business on a platform like Signal must be captured, regardless of whether the messages discuss the planning of an office holiday party or an airstrike. The policies also specify when employees must forward digital copies of the messages and even include a timeline for preservation. They thus clearly prohibit the destruction of any messages related to official Government business — including non-email records and those that are responsive to FOIA requests — and provide adequate guidance on record preservation. Cf. Armstrong v. Exec. Off. of the President (Armstrong II), 810 F. Supp. 335, 341 (D.D.C. 1993) ("Defendants' record keeping system violates the FRA because it does not save all the information contained in these electronic records."), aff'd and remanded Armstrong v. Exec. Off. of the President (Armstrong III), 1 F.3d 1274 (D.C. Cir. 1993).

To be sure, Plaintiff is correct that the policies do not specifically explain how agency heads should ensure compliance for purposes of responding to FOIA requests, spell out precisely how digital messages should be preserved, or define the circumstances that might warrant the use

of electronic messaging platforms like Signal.  See P.I. Reply at 14–18.  Additional details of this nature would certainly enhance the policies' clarity, but their omission does not render the policies inadequate.  Cf. Pompeo, 2020 WL 1667638, at *6 (declining to find policies deficient when they "do not grant individual employees 'unchecked discretion' to comply (or not) with the FRA").

The agency-head Defendants' actions following this Court's Order to preserve the Houthi Chat, see Minute Order of Mar. 27, 2025, underscore the sufficiency of the policies.  Once agency-head Defendants received the Order, they did not appear to have any difficulty in following their respective agencies' policies to preserve the messages that had not yet been deleted.  See, e.g., 2d Pilkerton Decl., ¶ 6 ("[O]n March 27, 2025, images were taken from the phones of both Secretary Bessent and Mr. Katz of all existing messages from the 'Houthi PC Small Group Chat' and emailed to both Secretary Bessent and Mr. Katz."); 2d Bennett Decl., ¶ 2 ("Screenshots were taken of the existing Signal application messages that are at issue in this case and have been preserved in a record keeping system within the office of the Secretary of Defense.").  For these reasons, Plaintiff's claim that the agencies' formal recordkeeping programs violate the FRA is unlikely to succeed.

2.    *Informal Policy*

Even though the formal policies suffice, American Oversight further alleges that Defendants "have established informal policies or practices within their respective agenc[ies'] recordkeeping programs that unlawfully permit[] the creation and automatic deletion of Signal messages pertaining to government business."  Am. Compl., ¶ 195; see also id., ¶¶ 194–99; P.I. Br. at 22–23; P.I. Reply at 5–14.  Plaintiff appears to contend that the agency heads' FRA-noncompliant behavior trickles down to their subordinates, leading to agency-wide policies that

permit the same unlawful activity.  See e.g., P.I. Reply at 5 ("[T]the agency-head Defendants, through their actions openly ignoring the nominal written policies, create their agencies['] actual policies.").

This Court's previous decisions in Pruitt, 319 F. Supp. 3d 252, and Pompeo, 2020 WL 1667638, underscore the distinction between a de facto, agency-wide policy that results in systematic violations of the FRA and discrete, unauthorized infractions committed by individual employees.  As explained above, the former is actionable under the FRA while the latter is not. In deciding whether to dismiss the case in Pruitt, this Court found that the plaintiff had sufficiently alleged that the Environmental Protection Agency had an unofficial policy of refusing to create records in violation of the FRA.  See 319 F. Supp. 3d at 259–60.  The allegations included verbal instructions to staff not to create written records of substantive matters and bans on notetaking in meetings, as well as the Administrator's use of alternate phones to evade call-log records, deliberate avoidance of email to prevent documentation, and the installation of a $25,000 soundproof privacy booth.  Id. at 255.

The Court reached the opposite conclusion in Pompeo, determining that the allegations were insufficient to establish that the State Department had implemented an inadequate informal policy.  See 2020 WL 1667638, at *5–6.  There, the plaintiff alleged only two calls between American and Ukrainian officials that were purportedly concealed, a meeting between a Presidential advisor and the Crown Prince of Saudi Arabia "that U.S. embassy staff was not 'read in on,'" and business conducted by two advisors via personal email accounts and messaging systems.  Id. at *2.  Given that the latter of these allegations concerned "officials who [were] either not members of the State Department or [were] not subject to the FRA at all" — as the President and his senior advisors are subject to the Presidential Records Act rather than the

12

FRA — and that the rest of the claims illustrated only "a few isolated actions involv[ing] some State Department personnel," the Court held that the plaintiff had failed to show that the agency had adopted a policy or practice that violated the FRA. Id. at *5.

Bearing this dichotomy in mind, the Court now turns to the alleged informal agency policies. Plaintiff argues that the agency heads' personal conduct establishes the "agencies' actual policies and practices," P.I. Reply at 13, by creating for their staff "a policy orchestrated from the highest levels." Id. at 12 (quoting Pompeo, 2020 WL 1667638, at *5–6). American Oversight is correct that the involvement of agency heads in unlawful practices is a matter of significance, as such conduct could reasonably be expected to influence the behavior of subordinate employees and agency-wide cultures regarding recordkeeping. Plaintiff has not alleged sufficient facts, however, to plausibly support the conclusion that this trickle-down effect has, in fact, occurred. Instead, it has merely stated that "Signal is widely used in government" and "comes 'pre-installed' on government devices." Am. Compl., ¶¶ 78, 82. It has not, for instance, alleged widespread use among non-agency-head employees or any message deletions by non-agency heads, nor has it shown that agency heads instructed employees to avoid creating paper trails, as in Pruitt. See 319 F. Supp. 3d at 260. This argument thus does not move the needle.

In a last attempt to revive this claim, American Oversight further asserts that courts have found agency policies that affect just one group within the agency to be widespread enough to violate the FRA, such as in America First Legal Foundation v. Becerra, 2024 WL 3741402 (D.D.C. Aug. 9, 2024). See ECF No. 30 (Hrg. Tr.) at 8:11–17. In other words, it contends that a policy does not need to be genuinely agency wide to be unlawful. Becerra, however, dealt with the Center for Disease Control's practice of "delet[ing] former lower-level employees' email

accounts (and any emails remaining in those accounts) thirty days after the employee's departure from the agency." 2024 WL 3741402, at *2. In that case, the challenged policy resulted in the deletion of a substantial proportion of agency employees' messages and thus could not be characterized as an "isolated violation[] of the guidelines governing records creation." Pompeo, 2020 WL 1667638, at *5 (emphasis omitted). In contrast, Plaintiff alleges here that only one individual in each agency is deleting records in violation of the FRA. The situations are thus not parallel; this case is more akin to Pompeo than to Becerra or Pruitt.

Because Plaintiff is not likely to succeed in showing that Defendants have inadequate recordkeeping practices, it is not entitled to a preliminary injunction on that claim.

B.    Enforcement Action

As previously noted, the FRA imposes on agency heads and the Archivist various mandatory duties. Section 3106(a) requires agency heads to "notify the Archivist of any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency" (notification duty), and, "with the assistance of the Archivist," to "initiate action through the Attorney General for the recovery of records" that were "unlawfully removed" (initiation duty). If any agency head "does not initiate an action for such recovery or other redress within a reasonable period of time" after learning of "any such unlawful action," or if that agency head "is participating in, or believed to be participating in any such unlawful action, the Archivist shall request the Attorney General to initiate such an action, and shall notify the Congress when such a request has been made" (referral duty). Id. § 3106(b).

Based on this language, American Oversight requests that the Court (1) order that agency-head Defendants notify Archivist Rubio of all unlawful recordkeeping actions and —

14

with Rubio's help — initiate an action through the Attorney General as required by § 3106(a); and (2) order that Rubio ask the Attorney General to take action and notify Congress when he has done so as required by § 3106(b).  See P.I. Mot. at 2.  Agency-head Defendants and Rubio, the watchdog alleges, "as members of the Houthi PC Small Group Chat [and others,] know or reasonably should know that one or more messages in the Houthi PC Small Group Chat [and others] were or remain subject to automatic deletion in violation of the FRA."  Am. Compl., ¶¶ 158, 170, 202, 210.  Plaintiff claims that when agency-head Defendants were made aware of such violations, they each had (but neglected) nondiscretionary notification and initiation duties, id., ¶¶ 171–72; see also id., ¶¶ 41 (citing 44 U.S.C. § 3106(a)), 159–60, and that Rubio has not fulfilled his referral duty.  Id., ¶¶ 42 (citing 44 U.S.C. § 3106(b)), 205, 215.  As these types of claims are reviewable under the APA, see Armstrong I, 924 F.2d at 295–96, the Court now evaluates whether Plaintiff is entitled to preliminary relief on any.

> 1.    *Likelihood of Success on the Merits*
>
> a.    Available Relief

Before addressing American Oversight's likelihood of success on the merits, the Court clarifies Plaintiff's available avenues of relief under the FRA.  Agency-head Defendants may be enjoined only to notify Archivist Rubio of the impending deletion of Signal records in this case; they cannot themselves be required to initiate a recovery action for already-deleted messages.  That is because — setting aside for now any additional redressability concerns with the permanently deleted messages, discussed *infra* pp. 18–20 — agency heads are obligated by statute to initiate a recovery action only when records "have been unlawfully removed from that agency."  44 U.S.C. § 3106(a) (emphasis added); see Becerra, 2024 WL 3741402, at *5 (The agency head "must notify the Archivist if there is a risk of unlawful 'removal, defacing,

15

alteration, corruption, deletion, erasure, or other destruction' of agency records," but only has an initiation duty "in one instance: if agency records are unlawfully 'removed.'") (quoting 44 U.S.C. § 3106(a)); Am. C.L. Union Found. of Fla. v. ICE, 2023 WL 6461053, at *7 (D.D.C. Aug. 31, 2023) ("[S]ection 3106(a) contemplates referral to the Attorney General only where records have been 'removed' — not when they have been deleted or otherwise destroyed.") (quotation marks omitted).  Here, records are allegedly at risk of deletion, rather than removal, so § 3106(a)'s initiation obligation does not apply.  See Am. Compl., ¶¶ 70, 91.  Plaintiff thus may conceivably proceed on a notification cause of action but not on its claim that the agency-head Defendants must initiate a recovery action themselves.

The Court can, moreover, order the Archivist to request that the Attorney General initiate an action for recovery or other redress under § 3016(b).  The statute offers the Archivist no discretion on this point, stating that in cases where an agency head does not initiate action based on any unlawful activity (including impending deletion) or "is participating in, or believed to be participating in any such unlawful action, the Archivist shall request the Attorney General to initiate such an action."  44 U.S.C. § 3106(b) (emphasis added); Becerra, 2024 WL 3741402, at *8 (noting that § 3106(b) "imposes a broader enforcement duty on the Archivist than [§] 3106(a) does upon agency heads"); Am. C.L. Union Found. of Fla., 2023 WL 6461053, at *8 (same). When agency heads are involved in the unlawful activity or have not initiated action, then, the Archivist may be enjoined to submit a request to the Attorney General to take action herself and to notify Congress once he has made such request.

With that in mind, the Court turns to whether American Oversight is likely to succeed on the merits of its two remaining claims — i.e., the notification and referral components of its request for enforcement action.  It concludes that Plaintiff is likely to succeed only as to Signal

communications that have not yet been deleted, automatically or otherwise, from the app. As to
those messages or chats that have already been jettisoned, the Court can offer no redress.

> b.    Analysis

The record currently before the Court indicates that Defendants are aware of
recordkeeping practices that should trigger their FRA obligations and yet have thus far neglected
to fulfill them. American Oversight persuasively contends that agency-head Defendants were or
are part of chats set to auto-delete and that Rubio is already aware of some of these chats. The
watchdog asserts that news reporting and Defendants' congressional testimony indicates "that
the use of Signal to conduct official government business" is — or at least was — "widespread"
among senior Administration officials, including Defendants. See Am. Compl., ¶ 16; id., ¶¶ 78–
80 & nn.12–14. For instance, in addition to the Houthi Chat, reporting invoked by Plaintiff
indicates that the Secretary of Defense created a Signal group to conduct official business. Id.,
¶¶ 12–16, 96, 170–72.

As American Oversight observes, see P.I. Reply at 2, 6, Defendants do not meaningfully
contest these claims. While they argue that they have adequately preserved what was left of the
Houthi Chat, see P.I. Opp. at 7–9, 13–14, 20, they do not dispute that there is or was a wider use
of Signal. See id. at 9–10. Nor do they persuasively establish that all other Signal chats are
being or have been preserved in compliance with the FRA. Rather than dispute that allegation
outright, they circuitously assert that their "efforts to preserve the [Houthi Chat] refute" the
notion that there is a "widespread policy or practice that permits the use of Signal to conduct
official business outside the confines of the FRA." Id. at 18–19 (quotation marks omitted). But
the Court is not convinced that Defendants' *post hoc* preservation efforts with respect to one chat

— efforts undertaken only after the chat's inadvertent exposure by the media — compel the conclusion that they are *ex ante* complying with the FRA in all other chats.

For these reasons, the Court concludes that Plaintiff is likely to succeed in showing that there are FRA-noncompliant Signal chats, that agency-head Defendants have not fulfilled their mandatory duty to notify Rubio of their existence, and that Rubio has likewise neglected to fulfill his duty to ask the Attorney General to ensure the preservation of the messages contained therein.

Defendants respond that, regardless of the validity of Plaintiff's notification and referral claim, it is not redressable because all chats that have not already been preserved are permanently lost. See P.I. Opp. at 20–21. The Court agrees in part. Based on American Oversight's own representations, ordering Defendants to fulfill their statutory obligations could not lead to the recovery of messages that have already been deleted from users' apps. As Plaintiff itself has emphatically stated, "[O]nce Signal text message records are destroyed, they cannot be recovered, permanently depriving the public of their content." P.I. Br. at 26; see also Am. Compl., ¶ 50 ("Signal messages are stored only on an individual's device, with no copy or back-up of the messages retained on the Signal system or servers; this means that . . . once deleted, messages cannot be restored or retrieved."). When such a "'fatal loss'" has occurred, "a court order could provide nothing more" to redress the injury. See Cause of Action Inst. v. Pompeo, 319 F. Supp. 3d 230, 234 (D.D.C. 2018) (quoting Jud. Watch, Inc. v. Kerry (Jud. Watch, Inc. I), 844 F.3d 952, 956 (D.C. Cir. 2016)).

To be sure, it may in fact be the case that a Signal message is somehow recoverable even if it appears deleted from the app. But American Oversight has taken the opposite position, endorsing the representations made by Signal as a basis to argue that because there is no back-

end means of preserving Signal communications, the watchdog faces irreparable harm.  See P.I. Br. at 27 (quoting Signal's Terms & Privacy Policy: "Signal messages and calls cannot be accessed by [Signal] or other third parties because they are always end-to-end encrypted, private, and secure.") (alteration in original).  Although Plaintiff tries to walk that stance back — claiming in its Reply that recovery is feasible "[r]egardless of Signal's statement of policy," P.I. Reply at 19 — that belated assertion wilts in the face of its repeated claims to the contrary in both its Amended Complaint and Motion.  See Am. Compl., ¶ 50; P.I. Br. at 26–27.  Nor can its passing reference to the theoretical capabilities of this nation's intelligence agencies, see P.I. Reply at 19 (suggesting that "if any entity might have the wherewithal to recover deleted Signal messages . . . , it would be" the CIA or ODNI), overcome its hardline stance that deleted Signal messages are gone forever.

Similarly unavailing is the watchdog's observation, id. at 20, that in other cases courts have demonstrated a willingness to order the Attorney General to initiate an enforcement action to recover records thought to be deleted when, for example, the Government had "never once contacted [the application vendors] themselves."  Cause of Action Inst. v. Tillerson, 285 F. Supp. 3d 201, 208–09 (D.D.C. 2018) (noting instance in which Government was able to use "forensic techniques" to retrieve records previously thought unrecoverable); see also Jud. Watch, Inc. I, 844 F.3d at 955; Jud. Watch, Inc. v. Tillerson (Jud. Watch, Inc. II), 293 F. Supp. 3d 33, 39–47 (D.D.C. 2017) (discussing Government efforts to recover missing records), aff'd sub nom. Jud. Watch, Inc. v. Pompeo, 744 F. App'x 3 (D.C. Cir. 2018).   Plaintiff has provided no reason to believe that ordering the Attorney General to use her "coercive power" to "shak[e] the tree harder," Jud. Watch, Inc. I, 844 F.3d at 955, would bear any fruit with respect to already-deleted messages.  The Court therefore cannot conclude that American Oversight's request for

communications that have already fallen victim to Signal's auto-delete function remains redressable given Plaintiff's own representations to the contrary.

The Court nonetheless agrees with Plaintiff that no such issues attend the Signal chats that are at risk of deletion but are not yet gone with the wind. The FRA, as explained, requires Government officials to notify the Archivist — and the Archivist, in the case of inaction or agency-head participation, to request the Attorney General to initiate an action for redress — whenever there is "impending[] or threatened unlawful removal . . . , deletion, erasure, or other destruction of records." 44 U.S.C. § 3106(a)–(b). Because the looming erasure of automatically deleting Signal messages qualifies as such an imminent destruction of records, and because the Attorney General could prevent that destruction by instructing Government officials to halt the messages' deletion, it remains possible for the Court to provide relief.

Nor does the fact that the Attorney General presumably retains discretion over whether to respond to that request render Plaintiff's injury unredressable. It is possible that, were the Court to order Rubio to request enforcement from the Attorney General, she could decline to act — an independent action breaking the chain of causation and leaving American Oversight's injury unredressed. The mere possibility of an unredressed injury, however, is not enough to defeat standing in these circumstances. "When a litigant is vested with a procedural right" — here, a right of action under the APA to compel the performance of the non-discretionary duties listed in § 3106(a)–(b) — "that litigant has standing if there is <u>some possibility</u> that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." <u>Massachusetts v. EPA</u>, 549 U.S. 497, 518 (2007). Said differently, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability." <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555,

572 n.7 (1992).  As a result, in Committee for Full Employment v. Blumenthal, 606 F.2d 1062

(D.C. Cir. 1979), our Circuit held that the plaintiffs had standing to challenge an agency's

inaction in investigating their complaint, "regardless of whether," upon investigation, "their

complaint [was] ultimately found meritorious."  Id. at 1065; see also Lujan, 504 U.S. at 572 &

n.7; Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 261–62 (1977).

        The standing analysis here follows the same logic.  An order requiring Rubio to request

enforcement action from the Attorney General is the remedy the FRA itself has made available

to prevent the concrete injury American Oversight seeks to avert — namely, the permanent loss

of federal records.  There is thus, at a minimum, "some possibility" that enforcing this procedural

right will redress that injury.  Massachusetts, 549 U.S. at 518.  Requiring agency heads to notify

Rubio of any extant Signal chats serves the same function.  For any chats in which he is not

already a participant *qua* Secretary of State, see, e.g., Am. Compl., ¶¶ 78, 80–81 (alleging

multiple variously composed chats), the only reliable way to ensure that he knows about the chat

— and subsequently may *qua* Archivist refer the issue to the Attorney General — is for agency

heads to notify him of such chats.  Ordering the agency heads to notify Rubio is thus the

necessary first step in providing redress.

        Small surprise, then, that courts assessing whether to order enforcement actions under the

FRA have repeatedly assumed — albeit without specifically discussing the issue — that an

informational injury may be redressed through referral to the Attorney General despite her

enforcement discretion.  Indeed, the Circuit has stated that without notifying the Attorney

General of records issues, "there w[ould] be no effective way to prevent the destruction or

removal of records," Jud. Watch, Inc. I, 844 F.3d at 956 (quoting Armstrong I, 924 F.2d at 295),

and courts have ordered such referral when granting injunctive relief.  See, e.g., Becerra, 2024

WL 3741402, at *16; <u>Armstrong III</u>, 1 F.3d at 1288 n.12. When courts have found that redressability is a barrier to such an order, moreover, it has been because — as with the deleted Signal records here — there is no action that the Attorney General could possibly take to recover the records, and not because her enforcement discretion causes recovery to be merely speculative. <u>See, e.g.</u>, <u>Am. C.L. Union Found. of Fla.</u>, 2023 WL 6461053, at *6 (ordering notification of Attorney General when it appeared records were still recoverable); <u>Jud. Watch, Inc. II</u>, 293 F. Supp. 3d at 47 (declining to order defendants to initiate action through Attorney General because "there [were] no enforcement steps left for the Attorney General").

This Court thus concludes that American Oversight's contemplated injury relating to non-deleted messages can be sufficiently redressed by ordering notification of the Archivist and referral to the Attorney General. Because the record also shows that Defendants have not complied with these notification and referral requirements, Plaintiff is likely to succeed on the merits of its enforcement-action claim.

2.  *Irreparable Harm*

Beyond showing a likelihood of success on the merits, American Oversight must establish that its contemplated harm is irreparable and would likely occur absent an injunction. <u>See</u> <u>Glossip v. Gross</u>, 576 U.S. 863, 876 (2015). Courts have concluded that irreparable injury exists in FRA cases where there is a possibility that the information being sought would be deleted. In <u>Becerra</u>, for example, Judge Rudolph Contreras of this district made such a finding when the plaintiff showed that former CDC employees' emails might be deleted if an injunction did not issue. <u>See</u> 2024 WL 3741402, at *13–16; <u>see also</u> <u>Citizens for Resp. & Ethics in Wash. v. Off. of Admin.</u>, 565 F. Supp. 2d 23, 29–30 (D.D.C. 2008) (in litigation challenging Government's treatment of records potentially responsive to FOIA requests, noting that

irreparable harm was disposal of those records); cf. Citizens for Resp. & Ethics in Wash. v. Exec. Off. of President, 587 F. Supp. 2d 48, 59–61 (D.D.C. 2008) (finding "real and immediate" harm to plaintiff where it alleged that "e-mails will be lost in the future" "unless adequate preservation guidelines are promulgated and a recordkeeping system implemented").  When Signal messages are deleted, such messages are apparently "lost forever to history."  Armstrong I, 924 F.2d at 288.  Plaintiff's contemplated harm is thus irreparable and, absent injunctive relief, likely to occur.  Even if an injunction may not guarantee soon-to-be-deleted messages' preservation, Plaintiff has established that absent such an injunction, the messages will likely be permanently lost.

3.    *Balance of Equities and Public Interest*

Plaintiff must also show "that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  Winter, 555 U.S. at 20.  The two factors "'merge when,' as here, 'the Government is the opposing party.'"  Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).  Under these factors, the Court must "weigh[] the harm to [Plaintiff] if there is no injunction against the harm to the [Government] if there is."  Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016).

As previously established, Plaintiff faces irreparable harm if the preliminary injunction is denied.  The public, moreover, would benefit from any retention of communications that Defendants are able to accomplish.  On the other side of the ledger, the Government will not suffer any significant harm if its officials are required to comply with their duties under the FRA, as they are already obliged to do.  See League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful

agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (quotation marks and citations omitted).  Defendants do not contend otherwise, focusing their arguments solely on the potential burdens that court-ordered records-management policies could impose rather than any costs stemming from compliance with the statute's notification and referral mandates.  See P.I. Opp. at 21–22.  The balance of equities thus weighs in favor of American Oversight.

\* \* \*

As Plaintiff prevails on all four of the preliminary-injunction factors for the not-yet-deleted messages, the Court will  order Defendants to promptly fulfill their notification and referral obligations with respect to those messages.

C.    Preservation of Records

Plaintiff last seeks an injunction ordering agency-head Defendants to preserve all messages during the pendency of this action.  None of its claims provides a viable vehicle for such relief.  More specifically, to the extent that American Oversight seeks such a remedy stemming from its claim concerning the agencies' recordkeeping policies, it has not shown that it will prevail, meaning that relief is not available.  See Sebelius, 644 F.3d at 399 ("Because the plaintiffs have not shown they are likely to succeed on the merits, we conclude they are not entitled to preliminary injunctive relief.").

Nor is such a remedy available in conjunction with Plaintiff's enforcement-action claim. Enforcement remedies are limited, as explained, see supra Section II.B.1.a, to (1) ordering agency heads to notify the Archivist of unlawful actions and, in the case of records removal, to initiate action for recovery "through the Attorney General"; and (2) ordering the Archivist in certain circumstances to refer the matter to the Attorney General to initiate an action for recovery

24

or other redress, and to notify Congress once he has made such request.  See 44 U.S.C.
§ 3106(a)–(b); Kissinger, 445 U.S. at 148; see also Armstrong I, 924 F.2d at 294.  In other
words, a plaintiff who ultimately prevails in an FRA enforcement action cannot obtain
preservation as an independent remedy.

Indeed, the FRA has long been understood to offer administrative enforcement rather
than judicial review of individual cases.  After assessing the law's legislative history in
Kissinger, the Supreme Court concluded in 1980 that "Congress expressly recognized the need
for devising adequate statutory safeguards against the unauthorized removal of agency records,
and opted in favor of a system of administrative standards and enforcement."  445 U.S. at 149.
Following Kissinger, "'[b]ecause of the frequency of incidents of removal or destruction of
records,'" Congress "recognized" that the Act's "enforcement mechanism needed to be
strengthened" and it did so by requiring the Archivist to report violations to the Attorney General
if the agency head did not do so.  Armstrong I, 924 F.2d at 294 (quoting H.R. Conf. Rep. No. 98-
1124, at 27–28 (1984)).  Our Circuit found that such revisions only reinforced the idea that
Congress explicitly chose "to rely on administrative enforcement, rather than judicial review at
the behest of private litigants, to prevent the destruction or removal of records."  Id.  "A
frequently stated principle of statutory construction," moreover, "is that when legislation
expressly provides a particular remedy . . . , courts should not expand the coverage of the statute
to subsume other remedies."  Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414
U.S. 453, 458 (1974); see also Houston v. U.S. Dep't of Treasury, 494 F. Supp. 24, 29 (D.D.C.
1979) (applying this principle to Privacy Act).

If Plaintiff instead seeks preservation as a litigation hold, such a hold is not appropriate in
a non-FOIA case.  Cf. Citizens for Resp. & Ethics in Wash. v. DOGE, 2025 WL 752367, at *17

(D.D.C. Mar. 10, 2025) (issuing preservation order in FOIA case). To be sure, "[f]ederal courts have the inherent power to issue orders preserving information relevant to the claims and defenses brought before them." Id. (quotation marks omitted). In FOIA cases, however, plaintiffs sue to recover specific records, so the case would become moot if such records were deleted. In contrast, in APA suits to enforce the FRA, plaintiffs sue to prevent unlawful agency actions that result in the removal or destruction of records. While American Oversight seeks to preserve the Signal messages in this case so that it can later obtain them through FOIA requests, the APA does not create an independent right to access documents, nor does it typically support prospective remedies like document preservation. The Court, accordingly, cannot enjoin Defendants to preserve records at this juncture. Although preservation has already been ordered in this case, see Minute Order of Mar. 27, 2025 (ordering Defendants to "promptly make best efforts to preserve all Signal communications from March 11-15, 2025"), the Court did so solely to enforce an agreement struck by the parties.

> D.     Bond

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." As this Court has explained in another case, the D.C. Circuit has "recently expressed skepticism" that district courts may decline to require an injunction bond, J.G.G. v. Trump, 2025 WL 1577811, at *31 (D.D.C. June 4, 2025) (citing Nat'l Treasury Emps. Union v. Trump, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025); and Widakuswara v. Lake, 2025 WL 1288817, at *5 n.7 (D.C. Cir. May 3, 2025)), despite having previously noted the "widely recognized discretion" that such courts customarily possess "not

only to set the amount of security but to dispense with any security requirement whatsoever."
Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n, 636 F.2d 755, 759 (D.C. Cir. 1980).  In light of the Rule's mandatory language and our Circuit's recent guidance, this Court will require Plaintiff to post a security to receive a preliminary injunction.

    A "proper" amount here, however, is nominal.  Defendants have not shown that they will suffer any "material monetary injury" from the proposed injunction, see J.G.G., 2025 WL 1577811, at *31, which does not compel the Government to take costly steps or incur any damages.  Indeed, Defendants do not even attempt to claim that they will be forced to absorb any costs as a result of an injunction.  See P.I. Opp. at 22.  Instead, the Court's proposed Order requires only that they perform their mandatory notification and referral obligations — a minor imposition well within the scope of their official duties.  The Court will therefore order Plaintiff to post a bond of $1.00.

## IV.   Conclusion

For these reasons, the Court will grant in part and deny in part Plaintiff's Motion.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  June 20, 2025